**WESTERN UNION TELEGRAPH CO. v. KITCHEN et al. (No. 8359.)***

(Court of Civil Appeals of Texas. Galveston. Dec. 5, 1923. Rehearing Denied Jan. 3, 1924.)

**1. Telegraphs and telephones ⚖══65(1)—Petition for negligent failure to deliver death telegram held sufficient.**

In an action for negligent failure to deliver a death telegram after delivering a telegram announcing the sickness of plaintiff's sister, a petition alleging that because of the failure plaintiff went to her sister's home but on arriving there found that her sister was dead and that the body had been shipped to another town for interment, and that situated as she was plaintiff could not reach the funeral, *held* sufficient against a general demurrer.

**2. Telegraphs and telephones ⚖══66(4)—Evidence held to show failure to deliver telegram was proximate cause of plaintiff's not attending funeral.**

Evidence *held* to authorize a finding that plaintiff's failure to attend her sister's funeral was not due to a failure to exercise ordinary care on her part, but was proximately caused by the negligence of defendant telegraph company in failing to deliver a telegram informing her of her sister's death after delivering a telegram informing plaintiff of her sister's illness.

**3. Telegraphs and telephones ⚖══52—Care required to avoid consequences of negligence in delivering telegram.**

One who is threatened by damage by reason of the negligent conduct of another must exercise reasonable care to avoid the consequences of such negligence, and this rule is applicable in suits for failure to deliver a telegram.

**4. Negligence ⚖══136(9)—Question for jury.**

The question of what is reasonable or ordinary care in any given situation is a question of fact for the jury, unless the evidence is such that reasonable minds cannot differ in the conclusion to be drawn therefrom.

**5. Telegraphs and telephones ⚖══75—Finding held equivalent to finding of ordinary care to attend funeral.**

In an action for damages for failure to deliver a telegram, thereby causing plaintiff to miss her sister's funeral, a finding of the jury that the plaintiff situated as she was could not have reached the place where her sister was buried in time to have attended her funeral, necessarily includes a finding that she did not fail to use ordinary care to attend the funeral.

**6. Negligence ⚖══4—Ordinary care defined.**

The measure of ordinary care is always what a person of reasonable prudence would or would not do under the same or similar circumstances.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Action by Mrs. William Kitchen and husband against Western Union Telegraph Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

Hume & Hume and Baker, Botts, Parker & Garwood, all of Houston (Francis R. Stark, of New York City, of counsel), for appellant.

Woods, King & John, of Houston, for appellees.

PLEASANTS, C. J. This suit was brought by the appellees against the appellant to recover damages for mental anguish suffered by Mrs. Kitchen and alleged to have been caused by the negligent failure of appellant to deliver a telegram informing her of the death of her sister, and thereby preventing

---

⚖══For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error dismissed for want of jurisdiction February 20, 1924.

her from attending her sister's funeral and burial.

The following sufficient statement of the substance of plaintiffs' petition is copied from appellees' brief:

"Plaintiff alleged that on the 17th day of July, 1920, her sister, Mrs. Will Evans, then residing in the city of Fort Worth, was very ill, and her husband, Will Evans, delivered to the defendant's agent at Fort Worth a message to plaintiff's husband, William Kitchen, in care of the Houston Drug Company, but in fact sent for the information and benefit of the plaintiff, said message reading in substance as follows:

" 'Wife is bad off as can be to be alive.'

"That said message was transmitted by defendant and delivered to plaintiff in the forenoon of said July 17, 1920, and that immediately upon receipt of same she began her preparations to go to the bedside of her sister in Fort Worth, and, not hearing anything further from her said brother-in-law, or any one else, as to the condition of her said sister, she did go to Fort Worth, leaving Houston on the night of the 17th, but upon arriving there she found that her sister was already dead and that her body had already left Fort Worth for their home near Kerrville for interment, her said sister having died on the afternoon of the 17th of July; that the said Will Evans, after sending the above-mentioned telegram, and in the afternoon of the 17th of July, delivered to defendant's agent, charged with the duty of receiving messages for transmission, another message for transmission, addressed to her said husband, care of the Houston Drug Company, in substance as follows: 'Want to send wife home to bury her. Will leave on Katy in morning.'

"That the said Will Evans, at the time he delivered said message for transmission, advised the defendant's agent, charged with the duty of receiving said messages for transmission, that the purpose of said telegram was to advise the wife of the said William Kitchen, and her sister, of, first, the condition of his said wife, and, second, the death of said wife; and that he further advised the defendant that his wife was a sister of plaintiff and that she also had another sister in Houston; and that he was sending said message addressed to the said William Kitchen because the same would be more certain of delivery, as he could be found with the Houston Drug Company, and that upon receipt of said message the said William Kitchen would immediately advise plaintiff and her sister of the contents of the said message.

"That the last above-mentioned telegram was not delivered to her, or to her husband, although the same could and would have been delivered on the afternoon of the 17th of July had the defendant exercised ordinary care to deliver same, and that because of the failure of the defendant to deliver said last above-mentioned telegram, she went to Fort Worth on the night train, arriving there on the morning following, and found that her sister had already died, and that her body had been shipped to her old home near Kerrville, Tex., for interment.

"That if said message had been delivered, as it could and should have been had the defendant exercised ordinary care so to do, that she would have understood from said message, that her brother-in law, Will Evans, was taking the body of his wife, plaintiff's sister, to their home near Kerrville for burial; and that instead of going to Fort Worth she could and would have gone from Houston to San Antonio, and there met the corpse, and would have gone with same and been present at the funeral of her sister.

"That after she reached Forth Worth, on the morning following the death of her sister, and found that her body had already been shipped to Kerrville, she was there among strangers, and without money, and could not have reached Kerrville in time to have attended the funeral; and came back to Houston on the train leaving Fort Worth early in the night of the 18th of July, and could not and did not attend the funeral of her said sister, or see her after her death; and that because of all of which she suffered pain, mental anguish and poignant grief, to her damages in the sum of $1,500."

The defendant answered by general demurrer and general denial. The trial in the court below with a jury resulted in a verdict and judgment in favor of plaintiff for the sum of $1,500. The court submitted special issues to the jury, and in response to the charge the jury found:

"First. That the defendant was guilty of negligence in failing to deliver a telegram from Will Evans to W. N. Kitchen, advising of the death of Mrs. Evans.

"Second. That such failure to so deliver said telegram was a proximate cause of plaintiff not attending the funeral of her said sister, Mrs. Evans.

"Third. That if said message had been delivered within a reasonable time plaintiff would have attended the funeral of her sister.

"Fourth. That after arriving in Fort Worth and learning of the death of her sister plaintiff did not have money with which to defray her expenses to the place of the funeral.

"Fifth. That the plaintiff, situated as she was, upon arriving at Fort Worth, could not have reached the place where her sister was buried in time to have attended her funeral.

"Sixth. That she suffered mental and physical pain and anguish because of her failure to attend the funeral of her sister.

"Seventh. That she suffered damages, on account of her failure to attend said funeral, in the sum of $1,500."

The judgment entered by the court upon these findings recites "that all issues not submitted to the jury are here now resolved in favor of plaintiffs."

The only charges requested by the defendant were a general instruction to the jury to return a verdict for the defendant, and an instruction to return such verdict because "the failure of the plaintiff, Mrs. Kitchen, to attend or be present at the funeral near Kerrville, which occurred on July 20, 1920, was not the proximate result of any negligence on the part of defendant."

The general propositions relied on by appellant for a reversal of the judgment are that the evidence is not sufficient to show that the damages recovered by plaintiffs were

the proximate result of the negligence of the defendant, and that such damages "are too remote, contingent, speculative, uncertain and not within the contemplation of the parties."

These general propositions are based upon the following specific complaints against the judgment:

"The judgment is contrary to law and without evidence to support it in that it was not alleged and proven that plaintiff's going to Fort Worth acting upon first telegram precluded her from attending the funeral at the time and place it occurred had she chosen or desired to go and attend the funeral after reaching Fort Worth.

"The judgment is contrary to law and without evidence to support it in that the evidence shows, conclusively, that plaintiff had ample time within which to reach the place of burial and attend the funeral after she was advised upon her arrival in Fort Worth that the remains had been taken to Kerrville for burial, and that there was no intention on her part, after being so advised, to go to Kerrville, and that there was no legal warrant or justification for her failure to go to Kerrville from Fort Worth and there attend the funeral.

"The judgment is contrary to law and without evidence to support it in that it was not alleged and proven that plaintiff could not have reached the place of burial from Fort Worth in time to attend the funeral, if she had desired or had made any reasonable effort to do so."

[1] There were no special exceptions to the petition upon the grounds indicated in the foregoing propositions, but if such exceptions had been presented, we think the petition should be construed as alleging that the negligence of the defendant in causing plaintiff to go to Fort Worth in answer to the first telegram prevented her from attending the funeral of her sister, and that plaintiff, situated as she was, could not have reached the funeral of her sister after she arrived at Fort Worth and learned of her sister's death. As against a general demurrer the petition was clearly sufficient in these respects.

[2] The evidence bearing upon the issues presented by these propositions is as follows: Plaintiff testified:

"I went to Fort Worth on Saturday night, the 17th of July, 1920, in response to a telegram from my brother-in-law, Will Evans, to my husband, that his wife, my sister, was very ill. I would not have gone to Fort Worth that night if I had received the second telegram Mr. Evans sent, that is, the telegram upon which this suit is based, advising of the death of Mrs. Evans and that they would take her home for burial. If that message had been delivered, I would have gone to San Antonio and met them there and went home. * * * When I arrived in Fort Worth Sunday morning, after leaving Houston Saturday night, I knew my sister was in the sanitarium and I didn't want to waste time hunting their residence. * * * A policeman rang the sanitarium for me to find out something about if she was there and everything and they told him that she had already passed away and what undertaker took charge of the remains, * * * so he rang the undertaker for me and they told him that they left that morning over the Katy; that was the first information that I had that she was dead. The Katy at that time had already gone from Fort Worth—they held us up to let it pass by. I did not have any friends there in Fort Worth. * * * I left Fort Worth Saturday night and got to Houston Sunday morning. I did not attend the funeral of my sister. I did not see her after she was dead. I would have attended her funeral had I received this message. I suffered mental anguish as a result from failure to attend said funeral.

"In regard to whether I knew of any other train that I could have taken and gone to the funeral after I got to Fort Worth, I would say that I did not know how to go about finding out anything. There wasn't any way for me to have gotten from Fort Worth to Kerrville in time to have attended my sister's funeral. I didn't have any money to go from there. I didn't go prepared. I did not take any money with me. I don't know what it would have cost me to have gone. I don't know whether it is further from Fort Worth to Kerrville than to Houston. I didn't look into it. I didn't even think of going to San Antonio. I did not think there was any way for me to get there in time for me to attend the funeral. I didn't know a soul to go to in Fort Worth for any advice or get any money or anything. I didn't know at that time what time the funeral would take place in Kerrville. I didn't know, anything about when the corpse would reach Kerrville. I didn't have any information as to when the funeral would take place nor anything about the death of my sister except that the body had left there that morning.

"I sent a telegram to my husband that the body had been shipped to Kerrville—that was the telegram I sent just a little before 9 o'clock Sunday morning from Fort Worth in which I told him I was coming home. I said I didn't think of going to Kerrville from Fort Worth; it didn't enter my mind. I was up there to see my sister primarily before she died. I had hoped to reach Fort Worth before she died.

"I never did go to Fort Worth or San Antonio on the train. I did not know anything about the schedule of trains from Fort Worth to Kerrville through San Antonio. I did not learn Sunday morning just when the funeral of my sister would take place. On Sunday I didn't know anything about where the funeral was to take place. I didn't know when I could get to Kerrville on the first train from Fort Worth.

"I have testified that I telegraphed my husband immediately after I got to Fort Worth, that the remains had been carried away and that I would be home that night. I did not make any effort at all to communicate with anyone at Kerrville about the arrangements. I started to testify and you stopped me. The officer looked up the schedule for me and they told me I couldn't leave there before night. I couldn't get any train unless I took the interurban and went to Dallas a roundabout way, and I told you this morning that I didn't have the money to do that on. This officer was very nice. He telephoned to different depots to see

when the first train to San Antonio would leave and he said, 'That night.' I didn't have any intention of going, but he did that without my asking him at all. He did it through courtesy to find out what could be done. I didn't tell him that I didn't have the means; I didn't propose to make it public to everybody."

The undisputed evidence shows that a train left Fort Worth for San Antonio at 8:10 p. m. the day on which Mrs. Kitchen arrived in Fort Worth, and that if she had taken this train she could have made connections at San Antonio that would have enabled her to have reached Kerrville in time to have attended her sister's funeral, which occurred in the country about eight miles from Kerrville on the morning of July 20th, which was the Tuesday after the Sunday on which she arrived in Fort Worth.

The evidence further shows that the train from Fort Worth was scheduled to arrive in San Antonio at 7:30 a. m., which was the time of the departure of the morning train for Kerrville, and if Mrs. Kitchen had left Fort Worth on the Sunday evening train she would not have reached Kerrville in time for the funeral but for the fact that, because of the failure of the funeral party to make train connections at San Antonio, the funeral was delayed a day. None of these facts were known to Mrs. Kitchen, and, as stated in her testimony, she made no effort to ascertain when the funeral would occur, and no attempt to have it delayed until she could be present.

We have had no difficulty in reaching the conclusion that this evidence is sufficient to sustain the finding that, but for the negligence of appellant in failing to deliver the telegram, appellee could and would have been present at the funeral of her sister and, therefore, such negligence must be regarded as the proximate cause of the damages recovered by appellee, unless after she learned of appellant's negligence and realized its probable result she failed to use ordinary care to prevent or lessen the injury of which she now complains.

The undisputed evidence shows that Mrs. Kitchen could have reached Kerrville from Houston in time to have attended the funeral if the telegram had been delivered, as it should have been, before she left Houston for Fort Worth. Her testimony that she would have gone to Kerrville if the telegram had been delivered is uncontradicted, and is strongly corroborated by the fact that she went to Fort Worth as soon as possible after she learned of the desperate illness of her sister, thus showing her affection for her sister and her desire to be with her at the last.

It certainly cannot be held upon these facts, as a matter of law, that Mrs. Kitchen's failure to go to Kerrville from Fort Worth, under the circumstances shown by the evidence, shows that she would not have gone there if she had received the telegram before she left Houston.

We think it equally clear that it cannot be held as a matter of law that the evidence shows that Mrs. Kitchen's failure to attend the funeral from Fort Worth, situated as she was when she learned of her sister's death, was a failure on her part to use reasonable care and prudence to avert the injury which appellant's negligence had made imminent.

[3] No rule of law is sounder in principle nor more firmly fixed by the decisions than that which requires one who is threatened with damage by reason of the negligent conduct of another to exercise reasonable care to avoid the consequences of such negligence. This rule is applicable in cases of contract as in cases of tort, and has been uniformly applied in suits for failure to deliver a telegram. Southwestern Tel. & Tel. Co. v. Gotcher, 93 Tex. 114, 53 S. W. 686; Telegraph Co. v. Jeanes, 88 Tex. 230, 31 S. W. 186; Telegraph Co. v. Williams, 57 Tex. Civ. App. 267, 122 S. W. 280; Hocutt v. Telegraph Co., 147 N. C. 186, 60 S. E. 981.

[4] The question of what is reasonable or ordinary care in any given situation is generally a question of fact for the determination of the jury, and unless the evidence is such that reasonable minds cannot differ in conclusion to be drawn therefrom, the question cannot become one of law.

[5] The question of Mrs. Kitchen's negligence in failing to use ordinary care to attend the funeral after she reached Fort Worth and learned of her sister's death was not directly submitted to the jury. But we think the fifth finding of the jury, before set out, that "situated as she was upon arriving at Fort Worth (she) could not have reached the place where her sister was buried in time to have attended her funeral," necessarily includes the finding that she did not fail to use ordinary care to attend the funeral.

No request was made to have the issue more directly passed upon by the jury, and the trial court in the judgment rendered expressly resolves all issues not passed upon by the jury in favor of the plaintiffs.

In this state of the record the only question for us to determine is whether there is any evidence from which the court or jury could have reasonably concluded that Mrs. Kitchen was not negligent in failing to go to her sister's funeral from Fort Worth.

This question must be answered in the affirmative. When she arrived in Fort Worth and discovered that her sister had died and that her remains were then on the way to Kerrville to be buried at their old home in the country eight miles from Kerrville, she found herself in a city of entire strangers, with insufficient money to pay her fare to Kerrville, with no information as to when

the burial would occur, and, so far as the record shows, with no one at Kerrville or elsewhere with whom she could have communicated and had the funeral delayed. A grief-stricken woman in these circumstances should not be expected or required, in order to relieve herself of the charge of negligent failure to attend her sister's funeral, to show that she did everything that she might have done to have enabled her to be present at the funeral.

[6] The measure of ordinary care is always what a person of reasonable prudence would or would not do under the same or similar circumstances. We think, measured by this rule, the jury and court below were authorized to find that Mrs. Kitchen's failure to attend her sister's funeral was not the result of a failure on her part to exercise ordinary care after she arrived at Fort Worth, but was· proximately caused by the negligence of appellant in failing to deliver the telegram informing her of her sister's death. Telegraph Co. v. Johnsey, 49 Tex. Civ. App. 487, 109 S. W. 25; Telegraph Co. v. Bryson, 25 Tex. Civ. App. 74, 61 S. W. 549.

These conclusions require an affirmance of the judgment and it has been so ordered.

Affirmed.