## WESTERN UNION TELEGRAPH CO. v. SWEENEY.

### No. 1361.

Court of Civil Appeals of Texas. Eastland.
Dec. 14, 1934.

On Rehearing March 15, 1935.

Rehearing Denied April 5, 1935.

W. H. Flippen, of Dallas, for plaintiff in error.

M. F. Billingsley, of Munday, for defendant in error.

FUNDERBURK, Justice.

On September 7, 1932, H. B. Sweeney purchased 100 shares of General Motors stock, for $18.50 per share, amounting with certain service charges included to $1,887.50. A cash payment of 415 was made, and the contract, which was in writing, obligated the purchaser to pay the remainder in installments of $73.60 on the 6th day of each month thereafter, beginning with October 6, 1932, together with interest, etc. The contract further obligated the purchaser in the event the market price of the stock depreciated 10 per cent., or more, to pay Pulliam & Co., the sellers and brokers, a satisfactory sum to cover such depreciation, and in the event of failure to do so the brokers had the right and option, without notice, to

cancel the purchase agreement and terminate all rights thereunder. In pursuance of the last-named provision, Pulliam & Co., wired Sweeney on September 13th, as follows: "Further sharp declines in market necessitate you forwarding Three Hundred Dollars to protect contract advise by wire." This telegram was received at the Western Union's local office in Knox City at 10 o'clock a. m., and delivered at 1 o'clock p. m. of the same day. Promptly upon delivery Sweeney wired the brokers as follows: "Mailing check this eve sell contract when it reaches nineteen." When this telegram was received the brokers had already sold the stock at $15 per share. Sweeney could have, within three or four days after his stock was sold, repurchased the same at from $15 per share to $14.75 per share, but failed to do so. Had he bought it at that price and held same until on or about September 25, 1932, when the price was $19, or more, he would have made enough to offset his loss.

This suit was brought by Sweeney against said Telegraph Company to recover damages for alleged negligence in the failure to promptly deliver said telegram. Upon a nonjury trial the court gave plaintiff judgment for $402.50 with interest from September 13, 1932, at the rate of 6 per cent. per annum. The defendant Western Union Telegraph Company has appealed.

The appeal presents the single question of whether or not under the facts above stated the duty of plaintiff to exercise reasonable care to mitigate the damages resulting from defendant's negligent failure to deliver said telegram within a reasonable time included, as a matter of law, the duty to repurchase the stock sold, such stock being obtainable at, or below, such sale price. The trial court having resolved this question, along with defendant's negligence, against the defendant, the judgment of the court below cannot be disturbed unless it appears as a matter of law that the plaintiff was under the legal duty to repurchase said stock in an endeavor to prevent or minimize the damages.

The duty with which it is sought to charge the plaintiff, and the failure to perform which is relied upon to relieve the defendant from the consequences of its negligence, is variously stated, but sufficiently so in Tex.Jur., as follows: "It is a fundamental rule that one who is injured in his person or property by the wrongful or negligent acts of another,

whether as the result of a tort or a breach of contract, is bound to exercise reasonable care and diligence to avoid less or to minimize the consequences of such injury; he must protect himself from the injurious consequences if he can do so by ordinary effort and care and at a moderate expense." 13 Tex.Jur. p. 99. We are impressed with the logic of the view expressed by Mr. Williston, as follows: "It is usually said that the plaintiff is under a duty to mitigate damages; but the truth seems rather to be that damages which the plaintiff might have avoided without loss to himself are not really caused by the defendant's wrong, and therefore are not to be charged against him." Williston on Contracts, p. 2412, § 1353. If that were a correct statement of the principle, the burden of proof would be upon the plaintiff to negative negligence on his part in failing to prevent or mitigate damages. Evidence relating to such duty, and the breach thereof, would be developed under the plaintiff's pleading of the amount of damages. But the law is not so interpreted by the courts of this state. As said in Gulf, C. & S. F. Ry. Co. v. McMannewitz, 70 Tex. 73, 8 S.W. 66, 67: "This is but a branch of the doctrine of contributory negligence." In Belcher v. Missouri, K. & T. Ry. Co., 92 Tex. 593, 50 S.W. 559, 561, the Supreme Court said: "If the plaintiff showed negligence on the part of the defendant, he was prima facie entitled to recover all of the damages sustained, and the burden of proof rested upon the defendant to prove the negligence by which plaintiff enhanced the amount of the damage or failed to prevent the injury, as well as the extent to which such damages were enhanced, or to which they might have been lessened by the use of ordinary care on the part of the plaintiff."

As in the case of ordinary contributory negligence, the burden of tendering the issues by proper pleadings is upon the defendant. 13 Tex. Jur. 335, § 187; Porter v. Burkett, 65 Tex. 383; Baker v. Cobb, (Tex.Civ.App.) 221 S.W. 314; World's Special Films Corp. v. Fichtenberg (Tex. Civ.App.) 176 S.W. 733; Amarillo Oil Co. v. Ranch Creek Oil & Gas Co. (Tex.Civ. App.) 271 S.W. 145; Denby Motor Truck Co. v. Mears (Tex.Civ.App.) 229 S.W. 994; Panhandle & S. F. R. Co. v. Norton (Tex.Civ.App.) 188 S.W. 1011; Missouri, K. & T. R. Co. v. Smith, 49 Tex.Civ.App. 610, 108 S.W. 1195. Of course, it necessarily follows that the burden of proof is

upon the defendant. In addition to cases already cited, see Austin & N. W. R. Co. v. Anderson, 85 Tex. 88, 19 S.W. 1025; Stanley Manly Boys' Clothes, Inc., v. Hickey, 113 Tex. 482, 259 S.W. 160; Pandhandle & S. F. R. Co. v. Norton, supra; Houston, E. & W. T. R. Co. v. Browder (Tex.Civ. App.) 265 S.W. 227; Denby Motor Truck Co. v. Mears, supra; International & G. N. R. Co. v. Sandlin, 57 Tex.Civ.App. 151, 122 S.W. 60. It is believed that the only respect in which the principle in question differs from contibutory negligence in the applicability of any rule of law, including matters of procedure, is that while the latter is a defense against liability, the former is a defense pro tanto against the amount of damages. As in contributory negligence proper, the issue is ordinarily one of fact for the determination of the jury. Cooper v. City of Dallas, 83 Tex. 239, 18 S.W. 565, 29 Am.St.Rep. 645; St. Louis S. W. R. Co. v. Ricketts, 96 Tex. 68, 70 S.W. 315; Galveston, H. & H. R. Co. v. Crispi, 73 Tex. 236, 11 S.W. 187; Western Union Tel. Co. v. Johnsey, 49 Tex.Civ.App. 487, 109 S.W. 251; Western Union Tel. Co. v. Bryson, 25 Tex.Civ.App. 74, 61 S.W. 548; Waco Artesian Water Co. v. Cauble, 19 Tex.Civ.App. 417, 47 S.W. 538. Also, as in contributory negligence the question becomes one of law only when the facts are undisputed and reasonable minds can draw but one conclusion therefrom. Galveston, H. & H. R. Co. v. Crispi, supra.

The issue of plaintiff's negligence in failing to prevent or mitigate the damages was, under the law as declared in these decisions, very defectively pleaded. Apparently, it was thought that if within three or four days after plaintiff had notice that the stock had been sold, the price had not advanced beyond that at which the sale was made, plaintiff's failure to purchase back the stock would be at least presumptively negligence. It was not alleged that he was financially able to repurchase the stock. Such fact was not sufficiently shown by the allegation that he had sent $300 to cover margins. No fact was alleged to show that plaintiff knew that by a repurchase of the stock he could prevent or mitigate the damages. That was a thing plaintiff could not know.

However, since no question is made regarding the sufficiency of the pleadings, we shall dispose of the appeal upon the assumption that plaintiff's negligence in failing to prevent or mitigate damages was sufficiently pleaded. Does the evidence show conclusively as a matter of law that plaintiff failed to exercise ordinary care to mitigate his loss by failing to repurchase the same amount of stock at $15, or less, per share? We are inclined to think that the evidence shows conclusively that he was not negligent. By the defendant's negligence, for which damages are sought, plaintiff lost an investment. Was he under duty to make another investment in an effort to save the defendant from loss? This question seems to have been considered by the Supreme Court in the case of Western Union Tel. Co. v. Sheffield, 71 Tex. 570, 10 S.W. 752, 755, 10 Am.St.Rep. 790, wherein it was held: "A party is not required to invest further, in order to secure himself against the consequences of a breach of a contract by which he suffers injury." The investment was of a speculative character. Its nature was unmistakably disclosed in the telegram. The message itself charged the defendant with the knowledge that the value of the investment was not necessarily controlled by temporary depreciations in the price of the stock. Conceding the fact, which the evidence does not show, that plaintiff was able to repurchase the same or a like amount of the stock at the depreciated price, he could not know, at least he could not know with reasonable certainty, that he would thereby recoup even in part the loss he had sustained. Suppose plaintiff had purchased $300 worth of the stock at $15 on a margin basis, and by subsequent declines that had been lost. Would the defendant be justly chargeable therewith as a part of the damages? Unless it would, then the duty of plaintiff to make the purchase did not exist. If the exercise of reasonable care on plaintiff's part to mitigate the threatened damage required him to expend $300 in the repurchase of stock, and then if that too was lost he could, unless precluded for some other reason, recover the amount as damages. Wichita Valley R. Co. v. Wallace (Tex.Civ.App.) 17 S.W.(2d) 150.

It is, however, unnecessary for us to rest our decision solely upon the conclusion that as a matter of law the evidence showed no negligence on the part of the plaintiff. If plaintiff was not negligent as a matter of law, then there can certainly be no doubt, we think, that the issue was one of fact which is concluded by the findings of the trial judge.

Being of the opinion that no error is shown, and that the judgment of the court below should be affirmed, it is accordingly so ordered.

## On Rehearing.

LESLIE, Justice.

Pulliam & Co., brokers, were carrying 100 shares of General Motors Stock for the plaintiff H. B. Sweeney on margins. By the negligence or failure of the Western Union Telegraph Company promptly to deliver a telegram notifying Sweeney of a demand for additional margins, the transaction was closed out on September 13, 1932. The plaintiff Sweeney instituted this suit against the Telegraph Company to recover $402.50 damages, the amount remaining after deducting $12.50 left of the original margin. The sum sought to be recovered embraces the initial payment, purchase charges, commissions, etc.

The defendant entered a general and special denial of liability, and alleged its negligence, if any, was not the proximate cause of the plaintiff's loss, and that he negligently failed and refused to mitigate, or lessen, his damages, although he could have done so entirely by reinstating his contract, or repurchasing like stock at a price even less than that at which his stock was sold.

The trial was before the court without a jury, and at its conclusion a judgment was rendered in favor of the plaintiff for $402.50, with interest, etc. The Telegraph Company appeals, assigning many errors and briefing five propositions thereunder. These will now be considered.

Obviously this opinion is being written in the light of the plaintiff in error's motion for rehearing, and after a re-examination of all the contentions presented in the original briefs. The result of such reconsideration is that this court now reaches a conclusion different from that expressed in the original opinion. It, therefore, becomes necessary to state the reasons—drawn from the undisputed facts of the record—which impel us to these conclusions.

On September 6, 1932, the plaintiff purchased, through his brokers, Pulliam & Co., 100 shares of General Motors stock at $18.50 per share. It was a marginal deal in accordance with a contract entered into between the brokers and the plaintiff. The sum of $415 was deposited with the brokers, the same to cover initial payment, purchase charges, commissions, etc., on the transaction. These latter items amounted to $37.50, making the total cost of the stock $1,887.50. This amount, less the $415, left the sum of $1,472.50, which the plaintiff agreed to pay thereafter in installments at the rate of $76.63 per month, beginning October 6, 1932, with interest, etc. The contract obligated the plaintiff to maintain a margin of 10 per cent., or more, on the purchase price without regard to the maturity dates mentioned in the contract. This portion of the contract reads as follows: "Notwithstanding the agreement of Buyer to pay for said securities in installments at times provided for in this agreement, the Buyer agrees that if at any time during the life hereof, the market price of any security or securities as purchased herein shall depreciate Ten (10) or more per cent below the total Time Purchase price agreed to be paid by the Buyer, or if any securities deposited as part payment thereof, or to protect any contract or part of a contract, shall depreciate Ten (10) or more per cent below the market value on to the date of deposit, Pulliam & Company shall have the right and option to demand from the Buyer a sum satisfactory to said Pulliam & Company, and which said sum the Buyer agrees to pay to Pulliam & Company on demand, and when so paid by Buyer shall be credited to the amount of interest charges unpaid, if any, and the balance upon the amount of the total time purchase price unpaid. In the event of the failure of the Buyer upon any such demand being made, to forthwith pay to Pulliam and Company, the amount demanded by Pulliam & Company, Pulliam & Company may at the option of Pulliam & Company and without notice to Buyer, cancel this purchase agreement and terminate all rights, if any, as Buyer as contained herein."

Pursuant to the above provision, and in view of the depreciated market value of the stock on that day, the brokers, on September 13, 1932, at 8:54 a. m. wired Sweeney as follows:

"Further sharp decline in market necessitates your forwarding Three hundred dollars to protect contract advise by wire.

"[Signed] Pulliam & Company."

This message reached the telegraph office at Knox City at 10 a. m., and was delivered to the addressee at 1 p. m. Sweeney

wired Pulliam & Co., at 1:12 p. m. the same day the following message:

"Mailing check this eve sell this contract when it reaches nineteen.

"[Signed] H. B. Sweeney."

The telegram was received by Pulliam & Co., eighteen minutes after the stock market had closed, and the 100 shares of stock had been sold at $15 per share, or $1,500. The stock transaction being thus closed out, the brokers rendered Sweeney a statement of his account, which, after deducting purchase charges, etc., showed him to have a remaining equity of $12.50 from his original deposit or margin.

Pulliam & Co., received the check and telegram. In response to the latter they wrote him two letters on the same day, September 13, 1932, advising that his contract had been closed out, and suggesting that the same could be repurchased at the same price, or for less. In one of the letters they stated: "Upon receiving no response to our telegram with reference to additional payments for the protection of your contract, when General Motors declined to such a price that on further decline your equity would have been completely wiped out, contract was closed out at the market and statement covering same is herewith enclosed." Following this statement with optimistic trade talk that the "market is unquestionably headed upward," the brokers made the further suggestion: "If you would care to enter into another contract for the purchase of General Motors we believe * * * the same can be executed at about the same figure at which this contract was closed out, or even a lesser figure. We will watch the market and phone you when the time arises and you can then decide as to whether or not you care to have contract executed for this same stock or for other issues which may at that time be more attractive."

In the second letter of that date, Pulliam & Co., after stating some details as to the time of sending message, etc., and the necessity under prevailing market conditions of closing him out, informed Sweeney that: "If the price of General Motors had declined to a lesser figure than that at which your contract was closed out a greater loss would have been incurred, as you would have had no equity remaining. As written you * * * we can in all probability within the near future, perhaps just any day, execute another con-

tract for you at such a price that there will be no loss entailed * * *."

On the following morning, September 14, 1932, Pulliam & Co., called Sweeney over long-distance telephone and informed him he could buy the General Motors stock at $14.75 per share. While testifying Sweeney gave the following answers to questions propounded to him:

"Q. You could have bought it back next morning. How much could you have bought it back for? A. 14¾

"Q. Why didn't you do that? A. I didn't want to take another chance. * * *

"Q. You could have bought it back the next morning and saved a little money, couldn't you? A. Yes, sir.

"Q. You could have bought these identical 100 shares of stock, or some just like it, and you didn't do it because you were afraid of the market—and you could have bought it back at 14¾—that is $25.00 less than they sold you out for? A. Yes, sir.

"Q. If you had bought it at that time you would not have had any damages? A. No, sir. If I had bought back and sold on September 25th I would not have had any damages."

This character of testimony is accentuated by an agreement of the litigants incorporated in the statement of facts, and reading as follows: "It is agreed by and between the parties of this suit that after Mr. Sweeney learned that his contract had been sold for $15.00 per share, that he could have repurchased 100 shares of General Motors for $14.75, either on the 14th or several days thereafter, and that Mr. Sweeney did not re-purchase the stock because he considered the market too unstable; and further, that he requested the brokerage company, Pulliam & Company, to return the $300 previously sent to them on the 15th (13th) day of September, 1932."

The General Motors stock thereafter advanced and the stock sold on the market September 25th at $19 per share. The case will be disposed of on the theory that the Telegraph Company was negligent in the transmission and delivery of the original telegram.

■ Under the foregoing uncontroverted facts, we are of the opinion that the plaintiff failed to prove any damages proximately caused him by the defendant's negligent delay in the delivery of the tele-

gram. Considering the duty resting upon the plaintiff under the circumstances, the rule for measuring the amount of his damages, if any, is clearly stated in 62 C.J. p. 245, as follows: "Notice to Put up Margin. Where a broker has closed out plaintiff's margin transaction because of defendant's negligence in delivering a message requesting additional margins, the measure of damages is the difference between the price at which the deal was closed and the price at which plaintiff could have reinstated the transaction within a reasonable time after notice that it was closed."

The rule as just stated is taken from the opinion by the Supreme Court of Kansas in Maddux v. Western Union Telegraph Co., 92 Kan. 619, 141 P. 585. The rule is there applied to a particular state of facts showing its special application to the facts in the instant case. Further the principle, or rule, is one of general application, and is stated in 13 Tex.Jur. p. 99, as follows: It is a fundamental rule that one who is injured in his person or property by the wrongful or negligent act of another, whether as the result of a tort or a breach of contract, is bound to exercise reasonable care and diligence to avoid loss or minimize the consequences of such injury; he must protect himself from the injurious consequences if he can do so by ordinary effort and care and at a moderate expense."

The authorities cited in the text as announcing this rule are numerous, and the principle is elemental, entering into many damage suits. In this connection we call special attention to Western Union Telegraph Co. v. Peter & Neylon (Tex.Civ. App.) 160 S.W. 991; Western Union Tel. Co. v. Kitchen (Tex.Civ.App.) 257 S.W. 690; Wright v. Bank of the Metropolis, 110 N.Y. 237, 18 N.E. 79, 1 L.R.A. 289, 6 Am.St.Rep. 356; Baker v. Drake, 53 N.Y. 211, 13 Am.Rep. 507.

The opinion in the Maddux Case is based on facts identical in legal effect with those in the instant case. There the plaintiff purchased 10,000 bushels of corn for future delivery, the market declined, necessitating an additional margin of $300, as in the instant case. The broker wired for the additional margin, but the telegram was delayed, resulting in the closing out of plaintiff's contract. The following market day the corn could have been purchased for less than the price at which the contract was closed out. The plaintiff refused or failed to repurchase or reinstate his contract. He did, however, call on his brokers for a statement of his account with the view of suing the Telegraph Company for reimbursement. The court, after reviewing the facts and stating in substance the fundamental rule of preventive measures where one is injured by the negligence of another, concluded that inasmuch as the testimony showed that the plaintiff could have repurchased the contract in question on the following market day at a price less than that for which it was sold, and failed to do so, no damages resulted to him by reason of his failure to receive the telegram.

In the instant case it is undisputed that Sweeney not only could have repurchased the stock at a saving after receiving notice it had been sold, but he refused to reinstate the contract or repurchase the stock after being requested to do so by his brokers at a time when the stock was selling for less than when his contract was closed out. Hence, any loss that may have accrued to him is not to be attributed to the defendant's delay in delivering the telegram, but rather to his refusal to repurchase the stock, or his election to withdraw from the market, the effect of which was to render it impossible for him to thereafter be in a position to obtain future profits should the stock rise on the market, thereby affording him an opportunity to recoup his losses already sustained when the delayed telegram was sent him. He could not thus withdraw from the market and save his money in the event the market continued to recede, and later sue the Telegraph Company for speculative profits in the event the stock rose on the market.

Let it be assumed that Sweeney began his speculation, or for the first time attempted to purchase his stock on September 13th, when he received the delayed message. Suppose he had then wired his brokers $300 cash, with directions to buy General Motors stock at $15, and sell it at $19, and the message was not delivered in time to enable the brokers to execute the contract at $15 per share on that day, but on the following day, and for several days thereafter, the same stock was available at $14.75 per share. Could it be said with any degree of logic or reason that Sweeney would have been damaged by the delay in delivering the telegram? We think not, and yet the same

principle is involved under the facts of this case.

In his testimony he admits that if he had re-entered the market and made the purchase he would have lost nothing on the sale of his stock at the rise of the market on September 25th, and the trial court, in substantiation thereof, made the following finding: "I find as a matter of law that the plaintiff H. B. Sweeney could have, within 3 or 4 days after his stock was sold out, repurchase the same at from $15.00 per share to $14.75 per share, but failed to do so, and if he had bought the same and held such stock until along about September 25th, 1932, he would have made enough to offset his loss."

This finding, of course, is unchallenged in the record and is borne out by the undisputed facts.

Further, it is apparent that if the plaintiff had received his telegram promptly and sent his marginal check in time to have prevented the sale of the stock in question, and he had thereafter withdrawn from the market when the price was $14.75 per share, his loss would have been $25 greater than indicated by the evidence in this record. On the other hand, if he had repurchased the stock at $14.75, retained it until September 25th, and then sold it for $19 per share, his profit would have been $25 greater than it would have been had he received the telegram promptly and put up the additional margin in response thereto. In the light of the subsequent market developments, Sweeney, by the repurchase of the stock, or reinstatement of his contract, would have re-established his status quo, which if maintained until sale on the 25th of September would have meant an actual gain of $25. According to the testimony, he concluded to take 50 shares of the stock, but immediately countermanded the order and directed the return of the $300. Thus, in the light of the surrounding circumstances, plaintiff viewed the market as unpropitious and concluded to avoid the risk of additional loss.

Further, it is elemental that the loss which the plaintiff is attempting to recover was occasioned by his previous investment or speculation in the stock market, and by reason of the decline in values. This loss, except the "out" commission, had occurred before the suit message was ever sent. Such previous loss was the sole occasion for the sending of the telegram requesting additional margins. And the plaintiff's refusal under circumstances to reinstate the deal, or purchase the stock at the depreciated price and hold the same for the possible advance, which he could not be certain of, is, in our judgment, the sole proximate cause of his not being entitled to the speculative future profits due to the rising market. There was no possibility of his therefter being able to recover his losses on a rising market, if any. As a net result of the failure to deliver the telegram promptly to Sweeney on September 13th, he received $15 per share for his stock, whereon on the following, and several days thereafter, it was worth only $14.75.

The testimony does not show that had Sweeney elected to reinstate the contract, or replace the stock, the brokers would have charged an additional "in" and "out" commission, but had they done so that would have only been an item of damages under circumstances entitling plaintiff to recovery and could not effect the disposition of this appeal, or the legal principles involved. However, on his election to forego future speculations or investments in the market, there arose no occasion for the collection of such commissions.

As before stated, when one is threatened with damages by reason of the misconduct of another, he is required to exercise reasonable care to avoid the consequences of such neglect. The rule is stated by Chief Justice Pleasants, in the case of Western Union Telegraph Co. v. Kitchen (Tex.Civ.App.) 257 S.W. 690, 693, as follows: "No rule of law is sounder in principle nor more firmly fixed by the decisions than that which requires one who is threatened with damage by reason of the negligent conduct of another to exercise reasonable care to avoid the consequences of such negligence. This rule is applicable in cases of contract as in cases of tort, and has been uniformly applied in suits for failure to deliver a telegram." (Citing many authorities.)

This rule was followed by our Supreme Court in an opinion by Chief Justice Gaines in Western Union Telegraph Co. v. Jeanes, 88 Tex. 230, 31 S.W. 186. See, also, Western Union Telegraph Co. v. Williams, 57 Tex.Civ.App. 267, 122 S.W. 280.

Under the foregoing authorities and the testimony, it appears that the plaintiff, although under the legal duty to do so, failed, as a matter of law, to exercise

reasonable diligence and effort to prevent or mitigate his damages. He suffered none as a proximate result of the delayed telegram. The facts of the case have been duly developed.

The judgment of this court on a former day of this term is set aside, and the judgment of the trial court is now reversed and here rendered for the appellant. It is so ordered.

FUNDERBURK, J., dissents for reasons stated in the original opinion.