WESTERN UNION TELEGRAPH COMPANY V. H. B. SWEENEY.

No. 6908.   Decided June 9, 1937.
(106 S. W., 2d Series, 670.)

*W. H. Flippen* and *Dan P. Johnston,* both of Dallas, and *Francis R. Stark,* of New York City, for appellant.

On question of measure of damages and plaintiff's negligence in making no attempt to mitigate his damages. Western Union Tel. Co. v. Peter & Neylon, 160 S. W. 991; 62 C. J. 244.

*M. F. Billingsley,* of Munday, for appellee.

A person damaged by unreasonable delay in the transmission and delivery of a telegram, taking proper measures to mitigate his damages as soon as the same is delivered, will not be required to go into the stock market and speculate upon stock to recoup his losses, occasioned by neglect to deliver telegram. Mackey Tel. & Cable Co. v. Erhard, 264 S. W. 570; Western U. Tel. Co. v. Federolf, 145 S. W. 314.

MR. JUDGE TAYLOR delivered the opinion of the Commission of Appeals, Section B.

In the trial court H. B. Sweeney recovered judgment for damages against Western Union Telegraph Company for negligent delivery of a telegram of instructions to his stock brokers. Upon original hearing the judgment was affirmed by the Court of Civil Appeals. Upon rehearing this judgment was set aside and judgment was rendered that Sweeney take nothing, Associate Justice FUNDERBURK, who wrote the original opinion, dissenting. A motion for rehearing and to certify was then filed, which the court granted.

The facts are not disputed, and it is not contended by the company that it was not negligent in its delayed delivery of the telegram. Its defense is that no damages resulted to Sweeney resulting proximately from the delay, and further that Sweeney's failure to take such action as was made available to him by the company in the matter of reinstating the contract after he was closed out, precluded recovery by him. The certificate in so far as necessary to be stated, reads:

"On September 6, 1932, Sweeney purchased, through his brokers, Pulliam & Company of Dallas, 100 shares of General Motors stock at $18.50 per share. The transaction was one known as a marginal deal, the terms thereof being expressed in a written contract between Sweeney and his brokers. By its terms he was obligated to pay for the stock in monthly installments of $76.63. A cash payment of $415.00 was made at the time the contract was entered into, which payment included purchase charges and commissions on the transaction.

"A portion of the contract is as follows:

" 'Notwithstanding the agreement of Buyer to pay for said securities in installments at time provided for in this agreement, the Buyer agrees that if at any time during the life hereof, the market price of any security or securities as purchased herein shall depreciate Ten (10) or more per cent below the total Time Purchase price agreed to be paid by the Buyer, or if any securities deposited as part payment thereof, or to protect any contract or part of a contract, shall depreciate Ten (10) or more per cent below the market value on to the date of deposit, Pulliam & Company shall have the right and option to demand from the Buyer a sum satisfactory to said Pulliam & Company, and which said sum the Buyer agrees to pay to Pulliam & Company on demand, and when so paid by Buyer shall be credited to the amount of interest charges unpaid, if any, and the balance upon the amount of the total time purchase price unpaid. In the event of the failure of the Buyer upon any such demand being made, to forthwith pay to Pulliam

& Company, the amount demanded by Pulliam & Company, Pulliam & Company may at the option of Pulliam & Company and without notice to Buyer cancel this purchase agreement and terminate all rights, if any as Buyer as contained herein.'

"On September 13, 1932, at 8:54 o'clock A. M., the brokers wired Sweeney as follows:

" 'H. B. Sweeney
Knox City, Texas
" 'Further sharp declines in market necessitate your forwarding three hundred dollars to protect contract advise by wire.
" 'Pulliam & Co. 10AM.'

"This telegram was received at the Western Union's local office in Knox City, Texas, at 10:00 A. M., and delivered at 1:00 P. M. on the same day. A few minutes thereafter, at 1:12 P. M., Sweeney wired his brokers as follows:

" 'Mailing check this eve sell this contract when it reaches nineteen.                    (Signed) H. B. Sweeney.'

"This telegram was received by Pulliam & Company eighteen minutes after the stock market had closed and the 100 shares of stock had been sold at $15.00 per share. In response to it they wrote two letters to Sweeney on the same day, September 13, 1932, advising him that his contract had been closed out, and suggesting that the stock could be purchased at the same price, or for less. On the following morning, September 14, 1932, Pulliam & Company called Sweeney over long distance telephone and informed him that he could buy General Motors stock at $14.75. It was stipulated between the parties upon the trial that after Sweeney learned that his contract had been sold for $15.00 per share, he could have repurchased 100 shares of General Motors stock at $14.75 per share, either on September 14th, or for several days thereafter; that he did not repurchase the stock because he considered the market too unstable, and that he requested the brokerage company to return the $300 previously sent to it in response to the message first above copied. It was further stipulated that General Motors stock reached a price of $19.00 per share on September 25th or 26th, 1932. * * * We respectfully certify for your decision the following questions:

"(1) Under the undisputed facts, did Sweeney suffer any damages which were proximately caused by the negligence of the telegraph company?

"(2) Was Sweeney, as a matter of law, under the duty to mitigate his damages by repurchasing the stock sold, or like stock, at a time when it was obtainable at or below $15.00 per

share; the breach of which duty would preclude his right to recover damages for the negligence of the telegraph company?"

The rule with respect to the measure of damages due to negligence in delivering a message requesting additional margins is stated in 62 C. J. 245 as follows:

"Notice to put up margin. Where a broker has closed out plaintiff's margin transaction because of defendant's negligence in delivering a message requesting additional margins, the measure of damages is the difference between the price at which the deal was closed and the price at which plaintiff could have reinstated the transaction within a reasonable time after notice that it was closed."

The foregoing rule is applied in Maddux v. Western Union Telegraph Company, 92 Kan. 619, 141 Pac. 585, a case in which the facts are strikingly similar to the facts of the present case.

Since under the undisputed facts Sweeney could have reinstated his stock purchase on the next day, or for several days thereafter, at 25 cents per share less than the price at which he was closed out, he sustained no damage proximately resulting from being closed out. Not only was the market available for making purchases at the lower figure after the sale of his stock, but the company's representative called Sweeney the following morning after his stock had been sold at $15.00 per share and told him he could buy the same stock at $14.75 per share and thus reinstate himself in the market.

It is clear that if the market price of the stock had advanced before Sweeney had a reasonable time in which to repurchase, he would have sustained a loss resulting proximately from the company's negligence; but instead of having advanced, the price declined and was lower for several days after he learned he had been closed out. It is obvious that he sustained no damages by virtue of being closed out.

Under the rule quoted above the first question is answered in the negative.

Since no damage due to the negligence of the company was sustained it is unnecessary to answer the second question.

This holding and the reasons therefor are in accord with those set forth in the majority opinion of the Court of Civil Appeals written by Chief Justice, then Associate Justice, LESLIE, upon rehearing.

Opinion adopted by the Supreme Court June 9, 1937.