**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Appellant,**

v.

**Robert N. MILLER et ux., Appellees.**

**No. 16666.**

Court of Civil Appeals of Texas.

Dallas.

Feb. 25, 1966.

Rehearing Denied March 25, 1966.

Jackson, Walker, Winstead, Cantwell & Miller, W. B. Patterson and Jack Pew, Jr., Dallas, for appellant.

Goldberg, Akin, Gump, Strauss & Hauer, Dallas, for appellees.

PER CURIAM.

The appellees Robert N. Miller and wife sued appellant, a brokerage company, for damages for alleged breach of contract and recovered judgment for $22,200. The facts of the case appear without substantial dispute.

Miller had been a customer of appellant for some time, having purchased through it several corporate shares and commodities "on margin." These were held by appellant, which had advanced a substantial portion of the purchase price thereof, as collateral security. These securities are spoken of in the record as Miller's "long position," and the excess of the value thereof over the advances so made by appellant is called in the record Miller's "equity."

In the latter part of 1963 Miller became of the opinion that the stock of a certain corporation called "Syntex," which was then steadily rising in value on the market, would soon begin to decline in value to some amount substantially lower than its then market value. Having the courage of his convictions in this respect, he sold on the open market, through appellant, 300 shares of Syntex stock. He owned no such shares, so the transaction was what is called a "short sale," which is thus explained: Miller contracted to sell *and deliver* the stock within four days. Appellant agreed to lend the stock to Miller for delivery; it was delivered within the

four days, appellant crediting Miller with the proceeds of the sale and charging him on its books with the current market price of the stock so delivered, plus interest. Miller was required by law to deposit with appellant 70 per cent margin, meaning cash or acceptable securities of a value of at least 70 per cent of the sale price of the stock so sold. This 70 per cent margin deposit remained constant, i. e., Miller was not required to increase it if the stock increased in value, and he was not entitled to a refund of any part of it if the value of the stock declined. However, appellant required that Miller at all times maintain security, or "margin," equal to 30 per cent of the value of the stock, and Miller agreed to maintain this margin for appellant's protection, regardless of fluctuations of the market, until he should "cover" his short sales by purchasing the same number of shares of the stock he had sold "short." Naturally, Miller hoped to be able to buy the stock at a substantially lower figure than that at which he had previously sold it, and pocket the net difference as profit.

Unfortunately for appellees, the market price of Syntex continued to rise until on January 15, 1964, it reached 184⅞, or $184.875 per share. They had sold it for an average of $111 per share. Appellant had the right to demand additional security or "margin" but only to the extent of bringing the margin up to 30 per cent of the then market price of the 300 shares of Syntex stock. On January 13 Syntex stock was selling for about 160. Miller was then in New Jersey on business and, being snowbound, could not return to Dallas. However, he was in telephonic communication with appellant's "account executive," Robert Woodin, who told him on January 13 of a margin call of approximately $20,000. Both Miller and Woodin felt that this was too high, and Woodin agreed to have the figures rechecked to make sure that Miller's entire "long position" was properly credited. He told Miller on January 14 that the recheck revealed the same amount of credits and that, as the price of Syntex had advanced further, the margin call had now risen to $27,000. Miller replied that he could not meet such a margin call and to "go ahead and liquidate the Syntex," meaning that Woodin should go into the market and purchase 300 shares of Syntex for delivery to the lender. This was done, resulting in the sale of Miller's equities in his "long" stocks and the commodities.

These margin demands were much higher than authorized by the contract between the parties. A correct margin call on January 13 would have been $9,247, and on January 14 would have been $12,314, and on January 15, when appellant liquidated the account by purchasing the 300 shares of Syntex for Miller, a correct call would have been $15,043. Miller testified that he had good reason to believe that the price of Syntex would begin to decline after January 15, 1964, that Woodin agreed with him, and that he had intended to "ride out the storm" by liquidating his other assets to protect his position on Syntex; that he was able and intended to meet the call of $20,000 on January 13, though he considered it erroneous, but the next day, when Woodin not only insisted the call had been for the correct amount but that overnight it had been increased to $27,000, he saw no way to protect his Syntex position and accordingly ordered its liquidation. There was never a time when he could not have met a correct margin call and prevented liquidation of his Syntex account or any part thereof. This testimony was not disputed.

Appellant admitted that its margin calls of $20,000 and $27,000 were incorrect and at the conclusion of the evidence, outside the presence of the jury, stipulated that it was "liable for the damages, if any, sustained by plaintiff, which were proximately caused by the liquidation of the Syntex stock on January 15, 1964." The jury found, in response to Special Issue No. 1, that $22,200 would fairly and reasonably compensate Miller for his damages proxi-

mately caused by liquidation of his Syntex short sales account with appellant[*] on January 15, 1964. Two other issues were submitted to the jury and these will be noticed later. Judgment was rendered for Miller for $22,200, and appellant presents eight points of error on appeal, the first seven of which will be considered as a group, as they are in appellant's brief.

Points 1, 2 and 3 assail the judgment for lack of evidence to support the jury's answer to Special Issue No. 1. By its Points 4, 5, 6 and 7 appellant asserts error in that under the undisputed evidence Miller could have avoided, or at least substantially mitigated, his loss or damages. This last contention is based upon an offer made by appellant on January 21, 1964 to "reinstate" Miller in his "short" position as to 150 shares of Syntex; i. e., for Miller to instruct appellant to sell 150 shares short at the then market price of about 160, Miller to maintain the 30 per cent margin thereon, but not deposit the 70 per cent margin required initially by law, and appellant to credit his account with the sum of money equal to the difference between the price at which the sale could be made on January 21 and the price of 184⅞ at which the 150 shares had been repurchased on January 15 (which difference was estimated then by appellant to be about $5,200, but which actually would have been about $3,750). Miller rejected this offer as being unfair, contending he should be reinstated as to the entire 300 shares. Appellant argues that its offer, if accepted, would have fully compensated Miller for all damages flowing from the incorrect margin calls, the reasoning being that at the time these calls were made the price of Syntex stock had so advanced that Miller had already sustained a heavy loss, and that

appellant's only responsibility was "to reinstate him in whatever amount of Syntex was greater than the amount he would have been required to repurchase to make his equity 30% of his debt." Appellant says that Miller's insistence upon being reinstated as to the entire 300 shares is unrealistic and ignores the depletion of his equity already caused by the large increase in the market price of Syntex, "just as if appellant had not been entitled to make any margin call at all."

The court submitted appellant's theory to the jury as follows:

"SPECIAL ISSUE NO. 2

"Do you find from a preponderance of the evidence that after discovering the error, if any, in his account Robert Miller failed to take such action to reduce or minimize his loss, if any, as an investor of ordinary prudence would have taken under the same or similar circumstances?

"Answer: Yes."

In answer to Special Issue No. 3 the jury found that Miller's loss would have been reduced by $21,905 if such action had been taken. Appellant moved for judgment *non obstante veredicto* and, alternatively, that appellees recover only $295 (the difference between the findings in response to Special Issues 1 and 3). The court overruled this motion and sustained appellees' motion to disregard the answers to Special Issues 2 and 3 and for judgment for $22,200 on the answer to Special Issue No. 1.

◼ In this we think the court was correct. There was clearly some evidence of probative value to support the finding of

* Miller also had a smaller account with Harris, Upham & Company, another brokerage company, and had sold short 100 shares of Syntex through it at about the same time he made the short sales through appellant. Taking the position that both of his short accounts had to be liquidated at the same time as a result of appellant's excessive margin calls, Miller sued appellant for the loss in both accounts. In answering Special Issue No. 1, however, the jury found no damages with respect to the Harris, Upham account. As appellees make no point of this, the Harris, Upham account will not be noticed further.

$22,200 damages, and we cannot say that it was insufficient to do so or that the finding was so against the weight and preponderance of the evidence as to be manifestly wrong or unjust. The jury had a right to believe and find, under the circumstances shown by this record, that appellant wrongfully forced Miller to purchase 300 shares of stock at a cost of approximately $55,500 to cover his previous short sales, which had yielded him only approximately $33,300, by demanding margin far in excess of that authorized by their contract.

Appellant argues that this is an unjust result because it assumes that, having met correct margin calls, Miller would have covered his short sales when the market price receded to exactly the price at which he had sold, and that all he was entitled to was to be placed, not in the position he occupied when he made the short sales, but in the position he occupied when the wrong was committed, which was to have only about 140 shares of Syntex short in his account. Appellant's offer to place 150 shares short in the account, if accepted, would have restored him to the *status quo,* with no loss—would have made him whole. The jury having found in effect that an investor of ordinary prudence would have accepted this offer and by doing so would have reduced the loss to $295, no case was made for appellees for any amount in excess of $295.

While the argument on its face does not appear wholly illogical, it fails to convince us that reversible error occurred. We recognize the general rule that one injured by the wrongdoing or negligence of another owes a duty to exercise ordinary care to avoid or mitigate his damages. Cooper v. City of Dallas, 83 Tex. 239, 18 S.W. 565; Bryant v. Pennington, Tex.Civ.App., 346 S.W.2d 367, no wr. hist.; Western Union Telegraph Co. v. Sweeney, Tex.Civ.App., 106 S.W.2d 663, 669, certified questions answered, 129 Tex. 595, 106 S.W.2d 670. However, under the

peculiar facts disclosed by this record, we are of the opinion that there was no duty on Miller's part to accept appellant's offer and that it cannot be said that his failure to do so proximately caused his loss. That loss had already occurred. Appellant's offer to reinstate 150 shares of Syntex short in his account, *it so happened,* would have enabled Miller, had he accepted the offer, to recoup a large part of the loss already sustained. But this was because the market price of Syntex *happened* to continue to decline. Appellant could not and did not attempt to assure Miller that it would do so. It was an offer of an investment of the most speculative type. The price of Syntex might just as easily have taken a sudden upturn immediately after acceptance of the offer and continued upward until Miller could no longer have protected his position. Miller had only a very short time in which to make a decision, and a determination of whether a reasonably prudent investor would have accepted the offer must be made in the light of the situation as it existed and was known to Miller *at that time,* not weeks later when it was known that the market price had continued to decline and that it would have been wise to accept.

It is our view that if Miller had seen fit to take this additional risk, he should be the one to benefit from the successful venture, not appellant. Appellant's view is that the success which would have rewarded the risk thus taken by Miller should redound to its benefit by wiping out, in part at least, its liability for its own wrongdoing. We do not agree with appellant.

There does not seem to be any reported case passing upon this precise question. Appellant relies heavily on Western Union Telegraph Co. v. Sweeney, Tex.Civ.App., 106 S.W.2d 663, certified questions answered 129 Tex. 595, 106 S.W.2d 670. Sweeney had bought 100 shares of General Motors Corporation stock through brokers in another city on margin at $18.50 per share. The market declined and the brokers wired him for $300 additional

margin. There was a delay of several hours in delivery of this telegram. Sweeney promptly replied by wire that he was mailing the check and instructing the brokers to sell his contract when it reached $19 per share. When Sweeney's telegram was received the brokers had already sold the stock at $15 per share, but they pointed out to him that the market had receded to $14.75 per share and that he could thus reinstate his contract at that price. He declined to do so because he "didn't want to take another chance," although admitting at the trial that he could have bought the stock back the next morning and saved a little money. He waited until the stock went back up to $19 per share and then sued Western Union Telegraph Company for his damages consisting of the initial payment, commissions, etc. The Commission of Appeals, in an opinion adopted by the Supreme Court, answered "No" to the following certified question: "Under the undisputed facts, did Sweeney suffer any damages which were proximately caused by the negligence of the telegraph company?" It was held that his loss resulted from his own failure to repurchase 100 shares of General Motors stock when he could do so at a price even less than that at which his brokers had sold out his contract.

That case is quite dissimilar to the one before us. Sweeney had *bought* his stock on margin, but Miller had *sold* on margin. If Sweeney had desired to continue his speculative venture, he could have bought back into the market at slightly less than the price at which he had been closed out and he still had the $300 with which to meet margin requirements. He could have put himself in exactly the same position he occupied at the time of Western Union's negligence. Not so with Miller; appellant's offer would not have permitted him to continue his speculation with respect to 300 shares of Syntex, but only 150. Moreover, it was shown, even stipulated, that Sweeney was financially able to reenter the market after liquidation of his account and repur-

chase the General Motors stock, but it was not shown or stipulated that Miller had the financial capacity to protect his position after his account was liquidated. Therefore, we do not consider Sweeney as controlling.

We think the earlier and much more frequently cited case of Western Union Telegraph Co. v. Sheffield, 71 Tex. 570, 10 S. W. 752, is of closer application. There the Telegraph Company was sued for damages for failing to make prompt delivery of a message, which Sheffield claimed prevented him from protecting a certain mercantile claim. It contended that Sheffield could *not* recover because he had failed to avoid or mitigate his damages by buying up prior liens on certain property, and on this point the court said:

"It is elementary that a party claiming damages must not be in fault in contributing to them by his own want of proper care; and such care must extend to the protection from further loss after the act complained of. But this rule must be rationally applied. It is not required that everything possible must be done to prevent or limit the extent of the loss. *It is not shown that the plaintiffs had the means, or could have commanded them, to advance the prior claims;* nor is it shown to have been the reasonable duty of the plaintiffs, from the condition of their business, to have done so, if they had had the means. * * * A party is not required to invest further, in order to secure himself against the consequences of a breach of a contract by which he suffers injuries."* (Italics ours.)

On the strength of the Sheffield case we hold that Miller was under no legal duty to accept appellant's offer, under the circumstances shown by this record. If Miller was under no such duty, as we have held, then it must follow that the inquiries contained in Special Issues Nos. 2 and 3 were immaterial. Being immaterial, they were properly disregarded by the trial

court. Appellant's first seven points are overruled.

By its eighth point of error appellant complains of the overruling of its objection to Special Issue No. 1 and its requested explanatory instruction. We have carefully inquired into the matter and, finding no prejudicial error revealed in connection therewith, we overrule this point also. Rule 434, Texas Rules of Civil Procedure.

The judgment appealed from is

Affirmed.