## MORGAN v. YOUNG.

## No. 4386.

Court of Civil Appeals of Texas. Beaumont.
July 21, 1947.

W. T. McNeil, of Beaumont, and Lewis Lanier, of Jasper, for appellant.

Faver & Barnes, of Jasper, for appellee.

WALKER, Justice.

E. D. Morgan, referred to hereinafter as plaintiff, brought this action against Danis Young, referred to hereinafter as defendant, to recover the sum owed on the promissory note of August 10, 1944, quoted below, and also to foreclose two liens securing this note, to wit, a deed of trust on defendant's farm in Newton county and a chattel mortgage on five per cent of defendant's 1944 and 1945 rice crops grown on that farm. By amendment, plaintiff limited his prayer for foreclosure to the deed of trust.

Defendant filed an answer, and also filed a cross action against plaintiff wherein he prayed recovery of $18,000 damages for plaintiff's breach of a contract he made with defendant on November 17, 1944, to lend defendant money with which to raise a rice crop on defendant's farm during 1945. Defendant's answer alleges that defendant was not liable to plaintiff on the note of August 10, 1944, because he made another note to plaintiff on November 17, 1944, which extended the time for paying sums due under the August 10 note; and further, in effect, that damages accruing to him under plaintiff's breach of contract had discharged his debt to plaintiff under the November 17 note.

Plaintiff filed a supplemental petition in reply to defendant's cross action. He denied that any note was made on November 17, 1944. He admitted that he made an agreement with defendant on that date to lend defendant money with which to produce a rice crop in 1945, but the contract alleged by him is materially different from that alleged by defendant. He plead that he was never obliged to pay over any money to defendant because defendant failed to perform two conditions on which plaintiff's duty to perform depended.

The cause was tried to a jury who assessed defendant's indebtedness on the August 10 note at $2,661.63. Other findings established plaintiff's breach of the contract, as defendant described that contract; and under still other findings the trial court fixed defendant's damages from this breach (net profit and certain expenses) at the sum of $7,020. From this the trial court deducted three items, namely, the amount of defendant's indebtedness, ($2,661.63), the value of rice produced by defendant in 1945 ($262.50), and the sum of $900 (which the jury found to be the sum defendant earned, or by the use of "reasonable diligence" could have earned "by engaging in a similar or different business or work after April 1, in 1945 until the end of that year"); and for the balance, to wit, $3,195.87, the trial court rendered judgment against plaintiff.

Plaintiff appealed from this judgment and has assigned 18 points of error for reversal. We make the following preliminary statement as a basis for our disposition of these points:

The evidence shows that plaintiff and defendant had been acquainted for several years prior to the transactions from which this litigation arose. Plaintiff was a carpenter and a roofing contractor who resided in Lake Charles, Louisiana; but his testimony shows that he knew, or claimed to know, a good deal about rice farming. Defendant was a rice farmer and had been for many years. He owned and resided upon a large tract of land in Newton county on which he grew rice in 1944 and 1945, and he apparently began to farm this land for rice as early as 1938 or 1939. Prior to that time he had been a rice farmer in Louisiana "south of Lake Charles." Plaintiff had loaned defendant money for use in defendant's Newton county farming operations over a period of time beginning in 1941 or 1942.

The course of dealing between the parties before 1944 was not shown in detail, but at various times during 1944, beginning on February 23, plaintiff loaned defendant sums of money totaling $7,309.82, with which to conduct his rice farming operations on the Newton county farm. On August 10, 1944, these advances amounted to $3,029.31, and on that date defendant executed and delivered to plaintiff the follow-

ing promissory note for that sum, and also for other sums to be advanced to him by plaintiff to complete the 1944 crop:

"$10,000.00 No. ———— August 10, A.D. 1944

March 1, 1945 after date, for value received, I, Danis Young, promise to pay to the order of E. D. Morgan Ten Thousand ($10,000.00) * * * Dollars at Newton, Texas with 5% per cent interest per annum from————until paid.

And in the event default is made in the payment of this note at maturity, and it placed in the hands of an attorney for collection, or suit is brought on the same, or same is collected through the Probate Court, then——agree that an additional amount of ten per cent on the principal and interest of this note shall be added to the same as collection fees.

                         S/ Danis Young
Due March 1, 1945.
Address————————."

Defendant also executed and delivered a deed of trust on his farm to secure the payment of this note.

Thereafter, on August 10 and subsequently down to and including November 17, 1944, plaintiff advanced to defendant on loan under this note nine separate items of funds totalling $4,274.70, and on December 20, 1944, charged defendant with an item of $5.81, for certain materials which he furnished defendant.

At some time not clearly shown by the evidence, defendant paid all of his indebtedness under this note except $2,661.63, the sum found to be owing by the jury; and on November 17, 1944 plaintiff and defendant made an agreement whereby the time for paying this sum was extended.

The agreement of November 17, 1944, was oral, excepting the chattel mortage of that date. The object of the parties was to provide defendant with funds to raise a rice crop in 1945 and presumably to provide plaintiff with an investment; and the extension of time for paying the balance owed under the August 10 note was only a part of this agreement (as the jury in effect found under Issues 1 and 6). The record exhibits some uncertainty by each party regarding the terms of his promise; each proved a contract materially different in one or more respects from the contract he alleged.

There is much conflict regarding some terms of this agreement and defendant's performance thereunder; but many material facts pertaining to the agreement were undisputed.

It is agreed that plaintiff did promise defendant on November 17, 1944, to lend him money to be used in growing defendant's 1945 rice crop, and that, when defendant became entitled to receive the money, the funds were to be paid over to him as required.

The evidence raises the issue that the agreement of November 17, 1944 was a bilateral contract between plaintiff and defendant, wherein plaintiff promised to lend to defendant, and defendant promised to borrow from plaintiff the money defendant needed to raise his 1945 crop. We quote from defendant's testimony: "Q. Did you and he jointly plan for you to grow a crop' in 1945 and him to finance it? A. Yes, sir." We think this is the general sense of the testimony of both parties. Each testified in detail regarding assets available to defendant on November 17, 1944, for growing defendant's 1945 crop, and each contemplated that defendant would actually grow a crop in 1945, that he would eventually require additional funds for use in this enterprize, and that he would procure these funds from plaintiff. It was a necessary element of plaintiff's theory of the facts that defendant's assets of November 17, 1944, would have enabled defendant to comply with the conditions precedent to plaintiff's performance (as plaintiff described those conditions) if these assets "had been properly spent," but that afterward defendant would need and plaintiff would lend to defendant additional funds.

The time for payment of the balance due under the August 10 note was effectively extended to the time when advances made to defendant by plaintiff would come due, namely, when the 1945 crop was harvested. Plaintiff testified that defendant was to repay plaintiff "when he finished his 1945

crop," and defendant testified that repayment was to be made "when we got through harvesting the 1945 crop."

It is of direct significance here whether plaintiff or defendant procured this extension, and on this there is a conflict. Defendant's testimony shows that he had funds on hand, in money and salable seed rice, with which he could have paid and did offer to pay on that date, namely, November 17, 1944, the balance he owed plaintiff on the August 10 note, but that plaintiff persuaded him not to do so. The following quotation from defendant's testimony explains plaintiff's action: "Well, it was our agreement the day before, me and Mr. Morgan—I wanted to sell the rest of the seed rice and pay him in full for the note of 1944 and he said this—that it wasn't any use to sell the seed rice because he was figuring on helping me for the crop of 1945 and it would cost us too much to rebuy the seed rice." Plaintiff denied that defendant offered to repay the balance owed on the August 10 note and implies that the extension was procured by defendant.

This extension had the effect of keeping defendant in funds and thereby enabling him to do some of the work required in raising the 1945 crop; and this was at least one reason why the extension was made.

It is undisputed that defendant made and delivered to plaintiff on November 17, 1944, a chattel mortgage bearing that date which secured the payment of the August 10 note and created a lien on 5% of defendant's "entire rice crop which is now being grown and cultivated on (defendant's) farm in Newton county, Texas, and to be grown during the year of 1945."

The parties disagree as to how much money plaintiff promised to lend defendant, what defendant had to do before plaintiff was obliged to pay over funds to him, and whether defendant performed these conditions.

(a) Regarding the sum to be loaned: plaintiff testified that he was to lend defendant a sum not to exceed $2,500 (this, of course, to be in addition to assets in defendant's hands on November 17, 1944). Defendant gave testimony to this effect, namely, that plaintiff promised to advance to him, beginning on April 1, 1945, and at times thereafter during that year according to defendant's needs, such sums of money as defendant needed to grow his 1945 rice crop; but his testimony shows that he had in mind a definite total expense to be incurred by him in growing this crop. He said that by April 1, 1945, he had plowed about 300 acres of ground for planting in rice, and that it would have cost him about $10,000 to raise a rice crop covering this acreage. This sum represented the total cost of the crop.

■ (b) Regarding conditions and defendant's performance thereof: plaintiff testified that defendant was supposed to do three things before plaintiff advanced any money, namely, to construct a certain levee designed to protect the crop from flood waters, to plant the rice and irrigate it, and to furnish plaintiff with evidence showing what defendant had done with the funds and other assets left in his hands under the November 17 agreement. It was plaintiff's theory that defendant could have performed all of these conditions or could at least have planted and irrigated his crop, if he had made a proper use of the assets available to him. Plaintiff said that on November 17, 1944, defendant had $1,700 in money, had 120 to 125 sacks of seed rice ("perfect seed rice he put in his warehouse") and an unstated amount of rice in the Orange Rice Mill, and also had in his possession a large quantity of rice straw which could be, and was in fact baled and sold by the defendant. Plaintiff valued these assets at $4,000.

Defendant testified to a different arrangement. He admitted that he was supposed to build the levee, and declared that he had done so, and the jury found under Issue 4 that he "substantially complied with his promise." This disposes of the first condition raised by plaintiff. The second, namely, the obligation to plant and irrigate the rice, is of no significance here because plaintiff did not prove as a matter of law that the contract contained this condition and plaintiff waived any defense based upon the existence of such a condition because he did not request an issue submitting this matter. The existence of this condition was pleaded by plaintiff in defense to the cross action, and plaintiff therefore had to pro-

cure its submission to the jury. Rule 279, Texas Rules of Civil Procedure. The third condition went out of the case under the jury's finding in response to Issue 15, namely, that plaintiff's promise to loan defendant money was not made "on condition that defendant furnish monthly itemized statements of his expenditures of the cash" defendant had on hand on November 17, 1944. Issue 15 may not be as broad as plaintiff's testimony, but plaintiff says nothing regarding the sufficiency of Issue 15 to submit the question, whether defendant agreed to furnish the proof which plaintiff says he was to furnish; and the variance, if it exists, between issue and proof is immaterial under Rules 274 and 279.

It is a necessary inference from the testimony as a whole that defendant's 1945 rice crop would be grown on defendant's Newton county farm, but neither party undertook to say how many acres defendant was to plant. The plaintiff's testimony shows that he had a reasonably definite acreage in mind on November 17, 1944. He said that defendant had 120 to 125 sacks of seed rice on November 17, 1944, and that this rice would plant about 250 acres of land; and it it is to be inferred that he expected defendant to plant the acreage which he could plant with this rice. Defendant had farmed about 200 acres in 1944. It cannot be determined from defendant's testimony whether defendant had a definite acreage in mind on November 17, 1944. He assessed his assets at a much lower value than plaintiff placed on those assets, and his testimony showed that he expected to buy at least some of his seed rice. However, if plaintiff's theory of the facts is wrong, then defendant's testimony, if at all believed, that defendant had plowed about 300 acres of land for planting in rice, shows that before plaintiff's breach, defendant had fixed and designated the acreage to be planted. No complaint is made here that defendant's designation was improper.

The parties say nothing about the interest rate on money to be advanced under this agreement of November 17, 1944, and it is not necessary for us to determine what that rate would have been. The balance owed under the August 10 note bore interest at the rate of 5% stipulated in the note.

It was an issue of fact whether plaintiff ever refused to advance defendant any money, but the jury resolved this question in defendant's favor by their finding under Special Issue 3, that plaintiff "refused to advance any sums of money to defendant—after November 1, 1944." This finding is obviously based on defendant's testimony that he applied to plaintiff for money on April 1, 1945, or about that date; and that plaintiff denied him any funds.

Defendant made no effort to procure funds from any other person with which to grow a rice crop. He said that he planted what rice he had (63 sacks worth about $1,000) on 80 acres of land, and that he harvested only 15 of the 80 acres, producing only 35 sacks of rice. Apparently, the crop on the balance of the 80 acres was valueless. Defendant also bought a small sawmill with which he cut a small quantity of lumber. He said he purchased this mill in May, 1945, for $275, which he borrowed; that he began operation in June, 1945, and cut about 30,000 feet of lumber for which he got $25 to $32 a thousand feet; and that he made no profit from this enterprise. Other than the cultivation of the 80 acres, the operation of this sawmill seems to have been the only enterprise of any moment in which defendant engaged during 1945, subsequent to plaintiff's breach. The evidence shows various conflicts regarding matters occurring after plaintiff's breach, but it is unnecessary to define these conflicts.

It is apparent from the evidence that plaintiff was well acquainted with defendant and defendant's farm, and that plaintiff knew, or thought he knew, something about rice culture. He had definite ideas about the proper time to plow the land and when to plant the grain. He testified to sack and barrel weights used in measuring rice. He knew the acreage planted and the yield taken from this land in 1944, and said that "we only got 1600 sacks of rice, the best rice that has been raised in that part of the country", thus indicating some knowledge regarding past rice yields. He gave his opinion as to how much grain should be grown on 250 acres in "a standard crop year" and testified to "the prevailing market price" at the end of the 1945 harvest season for the type of rice grown.

Plaintiff's points will be discussed out of order.

Under Points 1 and 3 plaintiff says that the version of the November 17 contract which defendant asserted in the trial court is too indefinite to be enforced, and under Point 3, that this contract was unilateral.

The respective versions of this contract are set out above. Plaintiff says that the contract tendered by defendant was indefinite respecting: (1) the time or times when money was to be paid over to defendant by plaintiff, (2) the sum to be advanced on any one occasion, and (3) the total sum to be loaned to defendant by plaintiff. He says that this contract was unilateral because it left defendant with the choice, whether he would borrow any money at all.

Points 1 and 3 are overruled. We shall consider first, whether defendant's version of the contract was unilateral, and then, whether it was too indefinite.

We have had to go to the evidence for the complete versions of the contract for which the parties contended in the trial court because only a part of the agreement was submitted to the jury and also because neither party, as we have previously stated, abided by his pleadings. However, Points 1 and 3 question the legal sufficiency of defendant's trial version of the contract; plaintiff in effect says that the defendant's evidence is insufficient in two respects (certainty and mutuality), and our discussion will therefore be limited to these objections.

Defendant's version of the contract is sufficiently clear from the evidence. That contract was not unilateral for the following reasons:

█ (a) Defendant's testimony shows a bilateral agreement wherein plaintiff promised to lend to defendant, and defendant promised to borrow from plaintiff such money as defendant needed to raise his 1945 rice crop. The fact that such promises were made must be inferred from the testimony, but the provisions of an agreement can be proved by such a process of inference. Wegner v. Biering, Tex.Civ.App. 22 S.W. 258 (Op. on reh.).

(b) Defendant's testimony shows an independent consideration for plaintiff's promise, namely, defendant's assumption of an obligation to pay interest and defendant's delivery to plaintiff of additional security for the August 10 note.

█ The August 10 note bore 5 per cent interest and was payable on March 1, 1945, and the parties agreed that time for payment of the balance owed should be extended until the completion of the rice harvest, a time we judicially know to be subsequent to March 1. A substantial sum ($2,-661.63) remained unpaid under this note on November 17, 1944, and defendant's testimony shows that plaintiff and not he caused the extension to be made of the time for payment. The effect of defendant's testimony is to make plaintiff out to be the prime mover in a scheme which would have provided plaintiff with an investment while enabling defendant to raise a rice crop; and defendant's assumption of the obligation to continue paying interest on the August 10 note during the period of the extension represents a part of the price he paid for plaintiff's loan. So does the chattel mortgage he gave plaintiff on November 17, 1944, because he testified that he "signed the paper on the agreement that—for the 1945 crop—Mr. Morgan would finance me the money for the 1945 crop," and that he would not have executed the instrument if plaintiff had not so agreed.

█ Such an independent consideration, (that is, a consideration other than defendant's promise to borrow money from plaintiff) would support plaintiff's promise to lend defendant money. East Line & R. R. R. Co. v. Scott, 72 Tex. 70, 10 S.W. 99, pages 101 et seq. 13 Am.St.Rep. 758; Farmers' State Bank v. Mincher, Tex.Com.App., 290 S.W. 1090; Mayhew & Isbell Lumber Co. v. Valley Wells Truck Growers' Ass'n, Tex.Civ.App., 216 S.W. 225, pages 231, 232; Johnson v. Breckenridge-Stephens Title Co., Tex.Com.App., 257 S.W. 223, pages 225, 226; United Appliance Corp. v. Boyd, Tex.Civ.App., 108 S.W.2d 760; Texarkana Pipe Works v. Caddo Oil & Refining Co., Tex.Civ.App., 228 S.W. 586.

Plaintiff's argument that defendant's version of the contract left defendant free not to borrow any money and was therefore unilateral is also involved in his argument

that the contract is indefinite, and it may be finally disposed of under our determination regarding the question whether the contract is sufficiently definite to be enforced.

We hold that the contract was certain in law in each of the respects referred to by plaintiff.

■ (1) The total sum to be lent to defendant by plaintiff was fixed with sufficient certainty.

First, regarding acreage to be cultivated: Defendant's testimony fails to show whether he intended on November 17, 1944, to cultivate any definite acreage. Plaintiff apparently expected defendant to plant the acreage which defendant's seed rice would plant. However, we are only concerned here with the sufficiency of defendant's statement; and it is not material whether defendant construed the agreement on November 17, 1944 as fixed upon or limited to any specific quantity or tract of land out of his farm because defendant's testimony shows that before plaintiff's breach of promise, the defendant had plowed and had thus designated the land he intended to plant in rice. The scope of plaintiff's promise had been defined and made definite as respects the quantity of land and the location of the crop, and this result obviated lack of certainty in these respects which existed on November 17, 1944. East Line & R. R. R. Co. v. Scott, 72 Tex. 70, 10 S.W. 99, pages 102, et seq., 13 Am.St.Rep. 758; Stanley v. Sumrell, Tex. Civ.App., 163 S.W. 697; Crosby v. De Bord, Tex. Civ.App., 155 S.W. 647, as stated, defendant's designation has not been attacked.

■ Second, regarding the sum to be loaned: Defendant said, in effect, that plaintiff promised to loan him what he needed to produce his crop; and under the circumstances of this case the sum to be lent was fixed with sufficient certainty. We apply here the ruling made by the New York Court of Appeals in Stern v. Premier Shirt Corp, 260 N.Y. 201, 183 N.E. 363, 364. There defendants were engaged in the (established) business of manufacturing and selling shirts. Plaintiff was their employee, at work in this business, and he made an agreement with defendants for the formation of a corporation, of which plaintiff was

to be a member, to take over and operate this particular business; and defendant promised to loan this corporation funds "sufficient * * * to carry on the business." The court held that the amount to be loaned was sufficiently definite, saying: "It is clear that all parties—and particularly the defendants—were familiar with the financial requirements of the business and knew well what would be sufficient to carry it on. That required amount is susceptible to proof and hence the agreement may not be said to have been indefinite."

Such is precisely the situation here. Plaintiff and defendant were well acquainted. Each knew the land and each knew (or at least plaintiff claimed to know) something of the matters governing the cost of the defendant's rice crop. The cost of that crop could be estimated; there is testimony, at least from defendant and from plaintiff's witness Guillory as to the cost per acre of cultivating rice. This testimony conflicts, but such conflicts seem to be a normal incident of any litigation.

The Court of Appeals acted upon the following grounds: "Similar engagements are common enough among business men. Agreements to sell or to buy what will be 'needed' or 'required' have been enforced by the courts with little difficulty, where the surrounding circumstances indicate the approximate scope of the promise." This statement adequately expresses the rule of decision in this state governing such contracts as are referred to by the Court of Appeals. Cox, Inc., v. Humble Oil & Refining Co., Tex.Com.App., 16 S.W.2d 285; Jones Inv. Co. v. Great A. & P. Tea Co., Tex.Com.App., 65 S.W.2d 495; Grand Prairie Gravel Co. v. Joe B. Wills Co., Tex. Civ.App., 188 S.W. 680; Mayhew & Isbell Lumber Co. v. Valley Wells Truck Growers' Ass'n, Tex.Civ.App., 216 S.W. 225; Texarkana Pipe Works v. Caddo Oil & Refining Co., Tex.Civ.App., 228 S.W. 586; Big Four Ice & Coal Storage Co. v. Williams, Tex.Civ.App., 9 S.W.2d 177; City of Crosbyton v. Texas-New Mexico Utilities Co., Tex.Civ.App., 157 S.W.2d 418, page 422; McCall v. Texas Drag Line Service Co., Tex.Civ.App., 188 S.W.2d 243; Tyler Ice Co. v. Coupland & Norman, 44 Tex.Civ. App. 383, 99 S.W. 133.

The subject matter of the contracts litigated in the decisions just cited was property other than money; but the property to be delivered under these contracts represented money. If the quantity of goods promised is definite, then so ought to be the sum of money similarly defined. Neither can we distinguish the plaintiff's promise now before us on the ground that cultivation of defendant's rice crop was a more speculative and uncertain enterprise than the business enterprises before the courts in the decisions listed above. The testimony shows that the expense of cultivation could be estimated, and defendant had farmed the land for rice during some six or seven years prior to the transaction of November 17, 1944.

Finally, regarding the other matters to which plaintiff refers: Plaintiff says that the various times when money was to be paid over to defendant and the sum to be advanced on any one occasion out of the total sum to be loaned were not fixed. However, since the parties defined the period of time during which funds were to be advanced to defendant (defendant said, from April 1 throughout the balance of the year), the total sum to be loaned and the purpose for which the money was to be expended, they could leave to circumstances, namely, to defendant's needs as those needs might develop, the determination of when payments were to be made and what sums were to be paid over to defendants. See: Dale Oil & Refining Co. v. City of Tulia, Tex.Civ.App., 25 S.W.2d 671, and the decisions listed immediately above.

Under Points 4 and 16, plaintiff raises as a defense in bar of any recovery whatsoever under defendant's cross action what plaintiff declares to be a failure on defendant's part to minimize or prevent damages to him from plaintiff's breach of contract. Point 4 reads: "Since defendant Young failed to use any effort to borrow money from any source to put in his 1945 rice crop after he was advised April 1, 1945 plaintiff would not loan him the money, he, defendant, cannot recover of plaintiff the damages sued for herein." Point 16 reads: "Since the evidence shows that defendant failed to exercise due diligence after plaintiff refused him the loan of money April 1, 1945, he cannot recover anything of plaintiff herein."

Points 4 and 16 are overruled on the following grounds:

(a) Defendant knew, when plaintiff breached his contract, that losses impended for him which had not yet occurred. He had lost his contract with plaintiff. Whether he would also fail to earn during the year the money he had expected to earn under his contract with plaintiff remained to be determined.

(b) We assume, without deciding, that defendant was under some obligation to minimize the damages which might result to him from plaintiff's breach.

On this assumption, the following quotations adequately describe and define this obligation. In Brandon v. Gulf City Cotton Press & Mfg. Co., 51 Tex. 121, plaintiff, knowing that defendant, a warehouseman, had permitted plaintiff's cotton to become wet, shipped this cotton from Galveston to New York during the winter and upon arrival of the cotton in New York, the moisture in the cotton froze and the cotton was damaged. Said the court (respecting plaintiff): "It is well settled, that it is not only the moral but the legal duty of one who seeks redress for another's wrong to use due diligence to prevent loss thereby. The principle applies to a breach of contract, and a party is not entitled to compensation for injurious consequence from such breach, so far as he had the information, time and opportunity necessary to prevent them." In Belcher v. Missouri K. & T. Ry. Co., 92 Tex. 593, 50 S.W. 559, 560, plaintiff, who was feeding cattle at Gainsville, delivered a car of feed to defendant at Sherman, to be conveyed and delivered to plaintiff at Gainsville, and had defendant completed this shipment within a reasonable time, plaintiff would have received the car on Sunday night. However, defendant negligently delayed the delivery of this car until Tuesday, and plaintiff's cattle were injured for lack of feed. Defendant said that the plaintiff might have avoided this injury by buying other feed and in submitting this defense to the jury the trial court treated the defense as contributory negligence,

charging the jury that plaintiff could not recover if he contributed to the injury of his cattle by his own negligent failure to procure other feed. The Supreme Court held that the charge was erroneous, saying:

"The charge informed the jury, in effect, that, if the plaintiff failed to use ordinary care to prevent the injury which might arise from the defendant's negligence, he could not recover from the railroad company any damages sustained by him through its negligence. This charge applied strictly the rule of contributory negligence to acts which occurred after the injury had been inflicted, whereas the rule stated is applicable only to those acts which concur in producing the injury. Smithwick v. Hall & Upson Co., 59 Conn. [261], 271, 21 A. 924 [12 L.R.A. 279, 21 Am.St.Rep. 104]. If, after the defendant failed to deliver the car load of hulls within a reasonable time, the plaintiff, knowing that fact, failed to use ordinary care to prevent injury to his cattle arising from the want of hulls as feed, he would not be barred of the right to recover the damages actually caused to him by the negligence of the railroad company which he could not, by ordinary diligence, have prevented, but would be entitled to recover that part of the damages which his diligence, if exercised, could not have avoided."

And see Western Union Tel. Co. v. Jeanes, 88 Tex. 230, 31 S.W. 186; Waco Artesian Water Co. v. Cauble, 19 Tex.Civ. App. 417, 47 S.W. 538; Western Union Tel. Co. v. Kitchen, Tex.Civ.App., 257 S.W. 690; Barron G. Collier, Inc., v. B. Deutser Furniture Co., Tex.Civ.App., 256 S.W. 330.

The quotation just made from Belcher v. Missouri K. & T. Ry. Co. shows that defendant's breach of his obligation to minimize only barred his recovery of whatever part of his damages resulted from his own failure to minimize instead of from plaintiff's breach of contract. See also the other decisions cited in this discussion and in addition, see Ft. Worth & Denver City Ry. Co. v. Daggett, 87 Tex. 322, 28 S.W. 525; Donada v. Power, Tex.Civ.App., 184 S.W. 793.

However, if defendant breached his obligation to minimize his damages from plaintiff's breach of contract, defendant's failure to minimize constituted a defense in plaintiff's favor to defendants' cross action against plaintiff (to the extent just noted) which plaintiff had to plead and prove; and plaintiff was under the burden of procuring the trial court to submit this defense to the jury. We note that plaintiff in his supplemental petition assumed the burden of pleading (to some extent, at least) the matters he raises under Points 4 and 16. (1) Respecting the location of the burden of proof, and the type of proof required to meet this burden see Belcher v. Missouri K. & T. Ry. Co., 92 Tex. 593, 50 S.W. 559; Porter v. Burkett, 65 Tex. 383; Gulf C. & S. F. Ry. Co. v. Mannewitz, 70 Tex. 73, 8 S. W. 66; Western Union Tel. Co. v. Sheffield, 71 Tex. 570, 10 S.W. 752, 10 Am.St.Rep. 790; Austin & N.W. Ry. Co. v. Anderson, 85 Tex. 88, 19 S.W. 1025; Western Union Tel. Co. v. Jeanes, 88 Tex. 230, 31 S.W. 186; Stanley Manly Boys' Clothes, Inc., v. Hickey, 113 Tex. 482, 259 S.W. 160; Phelps v. Connellee, Tex.Com.App., 285 S.W. 1047; Efron v. Clayton, Tex. Civ.App., 35 S.W. 424; Southwestern Tel. & Tel. Co. v. Bross, Tex. Civ.App., 45 S.W. 178; Waco Artesian Water Co. v. Cauble, 19 Tex.Civ.App. 417, 47 S.W. 538; Weber Gas & Gasoline Engine Co. v. Bradford, 34 Tex.Civ.App. 543, 79 S.W. 46; Pacific Express Co. v. Walters, 42 Tex.Civ.App. 355, 93 S.W. 496; Jefferson & N.W. Ry. Co. v. Dreeson, 43 Tex.Civ.App. 282, 96 S.W. 63; San Antonio Light Publishing Co. v. Moore, 46 Tex.Civ. App. 259, 101 S.W. 867; Miller v. Sealy Oil Mill & Mfg. Co., Tex.Civ.App., 166 S.W. 1182; Bost v. McCrea, Tex.Civ.App., 172 S. W. 561; Worlds Special Films Corp. v. Fichtenberg, Tex.Civ.App., 176 S.W. 733; American Construction Co. v. Kleinie, Tex. Civ.App., 177 S.W. 1176; Bogata Mercantile Co. v. Outcault Advertising Co., Tex. Civ.App., 184 S.W. 333; Panhandle & S. F. Ry. Co. v. Norton, Tex.Civ.App., 188 S.W. 1011; Denby Motor Truck Co. v. Mears, Tex.Civ.App., 229 S.W. 994; Osage Oil & Refining Co. v. Lee Farm Oil Co., Tex.Civ. App., 230 S.W. 518; Amarillo Oil Co. v. Ranch Creek Oil & Gas Co., Tex.Civ. App., 271 S.W. 145; Id., Tex.Com.App., 288 S.W. 1114. (2) Respecting the location of the burden of procuring submission to the jury see Waco Artesian Water Co. v. Cauble, 19

Tex.Civ.App. 417, 47 S.W. 538 (conclusion, page 542); Texas & Pacific Ry. Co. v. McKenzie, 30 Tex.Civ.App. 293, 70 S.W. 237 (conclusion, page 238); El Paso & S.W. Ry. Co. v. Eichel & Weikel, Tex.Civ.App., 130 S.W. 922, page 941 ("Besides, we do not think, had there been an entire omission in the charge of an instruction regarding plaintiffs' duty to minimize the damages, it would have been affirmative error, such as could not have been obviated by defendant's requesting a special charge on the matter. But there was no such omission.") Denby Motor Truck Co. v. Mears, Tex.Civ.App., 229 S.W. 994; St. Louis S.W. Ry. Co. v. Bradberry, Tex.Civ.App., 237 S.W. 364; Western Union Tel. Co. v. Kitchen, Tex. Civ.App., 257 S.W. 690.

■ What plaintiff had to prove to meet this burden of proof is stated in the following quotation from Belcher v. Missouri, K. & T. Ry. Co., 92 Tex. 593, 50 S.W. 559, page 561: "What part of the damages the plaintiff should recover in such case must be determined by the jury from the facts. If the plaintiff showed negligence on the part of the defendant, he was prima facie entitled to recover all of the damages sustained, and the burden of proof rested upon the defendant to prove the negligence by which plaintiff enhanced the amount of the damage or failed to prevent the injury, as well as the extent to which such damages were enhanced, or to which they might have been lessened by the use of ordinary care on the part of the plaintiff." To same effect Osage Oil & Refining Co. v. Lee Farm Oil Co., Tex.Civ.App., 230 S.W. 518.

■ Defendant's obligation to minimize came into existence when plaintiff breached his contract—since under defendant's theory of the facts, defendant's cause of action against plaintiff arose at that time and knowledge of plaintiff's breach was communicated to defendant then. The very name and description given this obligation of defendant implies that it arose then, and we attach no significance to the fact that defendant's damages from plaintiff's breach may not have been then completely ascertained. (If we were to attach any significance to that fact, we would deny the application of the foregoing rules to many cases of breach of contract and to many torts, for it very often happens that the extent of the loss is not definitely ascertained when the tort occurs or the contract is breached.) The authorities cited above show that our courts have generally treated the duty to minimize as having come into existence when the particular contract was breached (that is, when the cause of action arose; the injured party usually learns of the breach when the breach occurs); but we will refer again to our quotations from Belcher v. Missouri, K. & T. Ry. Co., 92 Tex. 593, 50 S.W. 559, pages 560, 561, where the court clearly put the injured person under the duty to minimize (and under no other duty) when he learned of the railroad company's breach of duty to him, before his cattle had yet sustained any injury.

(c) We state these as general rules, to which there may, or may not, be exceptions. It is a question on this appeal whether these rules and authorities have any application to this case.

Under Point 4, plaintiff apparently makes two arguments, namely, one respecting the location of the burden of proof in this case, and one respecting the legal effect of the evidence adduced. His argument respecting the burden of proof presents the question noted above.

Plaintiff in effect says that the rules just stated do not apply to this case; and that instead of plaintiff having to show that defendant negligently failed to procure funds from some one other than plaintiff, the burden of proving that he could not obtain these funds rested on the defendant. Plaintiff's argument seems to be founded upon incidents of the distinction between general and special damages. Plaintiff says that money is presumptively available at all times and that the damages which ordinarily result from the breach of a contract to lend money (that is, general damages) will therefore be limited to any increase in the interest rate which some lender other than plaintiff may demand; that any other damages from the breach of a contract to lend money (such as the loss of profits and the expense items defendant claims here) constitute special damages which defendant must prove were caused by the plaintiff's breach

**850**

of contract, and that defendant will not have done this until he proves that he could not procure, from some source other than plaintiff, the funds which plaintiff promised to lend to him.

The matter at issue here is thus only a question of procedure.

■ Plaintiff's contention is denied. We hold that whatever necessity lay on defendant of procuring funds from sources other than plaintiff was only an incident of defendant's duty to minimize his damages (which we assume to exist), and was governed by the general rules stated above. Therefore the burden of proof rested on plaintiff to show that defendant breached any obligation he may have owed to procure these funds. It was so held (burden of pleading and of proof) in San Antonio Life Insurance Co. v. Griffith, Tex.Civ.App., 185 S.W. 335, a case involving a breach of a contract to lend money. The burden of procuring a submission of this defense to the jury accordingly lay on plaintiff.

Plaintiff's argument, though apparently founded upon incidents of the distinction between general and special damages, actually results in making a distinction between contracts to lend money and other contracts. We see no basis for holding that the duty to minimize arises under contracts to lend money at a time different from the time that duty arises under the other contracts referred to in decisions cited above; or for reversing the general rule as to the location of the burden of proof and of procuring submission of Issues to the jury. It can hardly be said that money is presumptively available to any person. It may be that accumulations of money are always at hand, but this money will only be available to one with credit, just as other items of property which we judicially know to exist are only available to one having money or credit. If any distinction is to be made between contracts to lend money and other contracts, as respects the matter under consideration, that distinction must have its basis in judicial history, and we have found no judicial history in this state which supports such a distinction. As a matter of fact, under plaintiff's argument, a duty to minimize could not arise under a contract to lend money in those cases where the injured party prays recovery of damages other than damages resulting from an increase in his interest rate.

Western Union Tel. Co. v. Hearne, 7 Tex.Civ.App. 67, 26 S.W. 478, 481, which plaintiff cites, seems to be anomaly if it is to be given the construction plaintiff gives it. That was an action by Hearne against Western Union to recover damages he sustained from a garbled telegraph message. Hearne said that the error cost him a loan with which he expected to prevent a sale of his property under a deed of trust. It was unnecessary to determine whether Hearne should have alleged or proved that he attempted to procure funds elsewhere, but the Court of Civil Appeals referred to various authorities holding that Hearne must minimize his damages, and from them the Court drew this conclusion: "In this case, (Hearne) should have alleged and proven that he was unable to obtain the necessary funds from other sources to discharge the debt, which, by his default * * * had been caused to mature."

It seems to us that the existence of Hearne's duty to minimize mislead the Court of Civil Appeals and caused them to infer that since Hearne owed the duty he must show that he complied with the duty, and that the Court of Civil Appeals was really applying to a contract to lend money exactly the same rule they thought applicable to other contracts—instead of the different rule for which plaintiff argues. We find no writ of error history for the Hearne case and must decline to apply it at least as plaintiff construed it. Plaintiff also refers to expressions in F. B. Collins Investment, Co. v. Sallas, Tex.Civ.App., 260 S.W. 261 and J. I. Case Threshing Machine Co. v. O'Keefe, Tex.Civ.App., 259 S.W. 222, 225, and to the annotation at 36 A.L.R. 1408. We might add Routon v. Rux, Tex.Civ. App., 143 S.W.2d 157. However, we need not discuss these authorities.

■ (d) We may now consider plaintiff's second argument under Point 4, namely, that since defendant admitted he had not attempted to borrow other funds, he had shown, as a matter of law, a breach of his obligation to minimize his damages.

It was in evidence that: (1) Defendant expected to spend about $10,000 on the rice crop to be grown under his contract with plaintiff. (2) To grow this crop, defendant had in hand on November 17, 1944, when the contract was made, assets worth about $2,700 (Defendant's story. Plaintiff put this value at about $4,000). (3) Defendant's farm was a tract of about 1,000 acres, but there is no evidence of its money value. It was mortgaged to plaintiff at all relevant times to secure a debt of $2,661.63, and the oral extension of the time for repayment was involved in the parties' dispute. Further, defendant was married and resided upon this farm, and thus had a 200 acre homestead exemption on it. (4) Defendant had an automobile and some farm equipment, but the value of this property was not proved. (5) Defendant resided within a relatively short distance of several towns where Banks were maintained. (Orange—30 miles. Newton—40 miles. Beaumont—50 miles). (6) After plaintiff's breach, defendant proceeded to cultivate an 80 acre rice crop, with the results heretofore shown. He made no effort to procure money needed to grow the 300 acre crop he said he had intended to grow, or the 80 acre crop he cultivated. (7) During June, 1945, he borrowed two small sums from individuals to use in another project. ($275, to buy a sawmill, and $300, to install the mill.) (8) See the statement at the beginning of this opinion for further details.

We hold that this evidence does not show as a matter of law that defendant breached his obligation to minimize his damages, because it does not show as a matter of law that defendant could have borrowed the money he needed, either for his 300 acre crop or for his 80 acre crop. Since the burden of proof rested on plaintiff to show that defendant breached his obligation to minimize, he had to show that defendant could have borrowed the money.

Plaintiff apparently had no faith in defendant's ability to repay the funds he agreed to loan defendant, since he breached his contract to lend defendant these funds. We note the following comment in Stanley Manly Boys' Clothes, Inc., v. Hickey, 113 Tex. 482, 259 S.W. 160, page 163: "In the case at bar, if Hickey really had all the net worth counsel for the company asserts he had, then before the company breached its contract it could and should have so ascertained. Being so advised, it had no earthly excuse for breaching its contract as it did. Why should this company refuse credit which it had already agreed to extend and then come into court and insist that some third party should and would have extended a similar credit?"

Defendant thought he could not get the money if he had tried. He testified: "Q. You made no other effort to borrow money than what you just testified to, did you? (Counsel refers to the time when defendant requested money of plaintiff, and was refused.) A. How could I borrow money? Q. All right, you didn't do it, did you? A. No, sir."

Defendant obviously had his financial condition in mind, and this justified his pessimism. As stated, defendant expected his 1945 crop to cost about $10,000. If he had assets worth $4,000 on hand on November 17, 1944, for growing this crop, as plaintiff said (instead of assets worth only $2,700 as he said) he would have had to borrow from plaintiff a sum in excess of $6,000. The evidence shows only one item of property belonging to defendant which might have supported a loan to him of such a sum, namely, his farm. The value of this tract was not proven, but the record exhibits circumstances which might have deprived it of any substantial worth as security. In the first place, defendant's homestead exemption covered 200 acres of this land. In the second place, any lender other than plaintiff would have had to take a lien subordinate to plaintiff's deed of trust, which secured the payment of a large sum, to wit, $2,661.63, and then face a possible necessity of buying in the plaintiff's debt and lien to protect his own loan. In the third place, defendant's debt to plaintiff was evidenced by a note due on March 1, 1945, a full month before plaintiff's breach, which was the moment when defendant's obligation to minimize damages took effect; and for a valid extension of this due date defendant had to rely upon an oral agreement which was a part of a

broader agreement already in dispute between plaintiff and defendant. It is a reasonable inference that defendant would have had to secure any substantial loan to be made; and under these circumstances one cannot say as a matter of law that defendant had the necessary security.

These circumstances also require us to hold that the evidence fails to show as a matter of law that defendant could have borrowed money needed to grow the crop he actually planted. Defendant planted what rice he had on 80 acres of land, and the probable cost of an 80 acre rice crop can be estimated. Defendant put the cost at $30 to $35 an acre. Plaintiff's witness Guillory thought that this cost would run from $20 to $25 an acre; but as we have previously stated, the effect of plaintiff's Points of Error is to question the legal sufficiency of defendant's evidence, and defendant is entitled to have us look to his figures instead of to plaintiff's. Defendant's figures indicated a total cost of from $2,400 to $2,800. This 80 acres had been plowed before plaintiff's breach, but the probable cost of plowing was insignificant, and defendant would probably have had to borrow substantially all of the indicated cost except the cost of his seed rice, which he had on hand and which he thought was worth about $1,000. Thus he would have needed from $1,400 to $1,800 more. However, one who loaned him this sum on the security of his farm (his only substantial asset proved) would have been, as stated, a junior lien holder, subject to the $2,661.-63 priority, already more or less involved in a dispute with plaintiff; and defendant was therefore, in a sense, a candidate for a loan covering not only the money which he needed to grow his rice crop but also a sum sufficient to buy in the plaintiff's debt and lien.

(e) This matter of casual connection between plaintiff's breach and defendant's loss was put to the jury to some extent in Issue 5, and was there found in defendant's favor. Under Issue 5, the jury found that "the failure of defendant—to plant more than—(80) acres in rice—was directly and proximately caused by the refusal of the plaintiff—to advance to defendant additional sums of money after November 17, 1944." If defendant's failure to plant more than 80 acres was caused by plaintiff's breach, it could not have been caused by defendant's failure to borrow money from other persons. Accordingly, it may be said that the finding in response to Issue 5 includes a finding that such damages as defendant suffered from not being able to cultivate a 300 acre crop were caused by plaintiff's breach instead of by defendant's failure to minimize his damages from that breach. See Western Union Tel. Co. v. Kitchen, Tex.Civ.App. 257 S.W. 690; St. Louis S. W. Ry. Co. v. Bradberry, Tex.Civ.App., 237 S.W. 364.

(f) Next, regarding Point 16: The lack of diligence charged against defendant under Point 16 seems to consist in defendant's cultivating his 80 acre crop without water when his evidence tends to show that for $400 he could have watered his rice, and further, in defendant's engaging in an unfamiliar enterprise, namely, the operation of the sawmill. Defendant's testimony shows that he borrowed $275 to buy the sawmill and that later on he borrowed $300, secured by a chattel mortgage on the mill, to install the mill for operation, from which plaintiff argues a lack of care in failing to procure the funds needed to water the rice.

Whatever lack of care this conduct tends to show obviously did not cause all of even the principal part of defendant's damages, and Point 16 may be overruled under the authorities cited above, (especially Belcher v. Missouri K. & T. Ry. Co.) on the ground that plaintiff failed to show what part of defendant's damages may be attributed to this lack of care. For we can not determine how much of defendant's damages resulted from his own conduct.

Further, the jury's finding under Issue 17 answers plaintiff's argument respecting the sawmill. Issue 17 and the finding in response thereto read: "From a preponderance of the evidence, what sum or sums of money, if any, did defendant, Danis Young, earn, or by the use of reasonable diligence he could have earned, if any, by engaging in a similar or different business or work after April 1 in 1945 until the end of that year? Answer by giving the

amount, if any, in dollars and cents. Answer: $900.00." Plaintiff received credit in the judgment for this $900, although defendant said he made no profit from the sawmill.

■ Defendant may not have been negligent in attempting to cultivate his rice without water. He was an experienced rice farmer, on the land cultivated, and he had a sizeable item of his own property at stake (about $1,000 worth of seed rice). Circumstances may have justified his action when he planted his rice. The same is true regarding defendant's purchase of the sawmill; his lack of experience in sawmill operation is not prima facie proof of negligence. The facts respecting these matters were not so fully developed as to justify our holding, as a matter of law, that defendant's cultivation of his 80 acre rice crop was negligent in any respect.

Under Points 5, 6, 7 and 10, plaintiff assigns error to the measure of damages employed by the trial court in assessing defendant's damages from plaintiff's breach of contract. The trial court's calculations are expressed in the judgment and these calculations show that the trial court determined from the jury's verdict what defendant's net profit would have been under the contract and what expenses defendant had incurred in attempting to grow his 1945 rice crop; and that the trial court awarded these sums to defendant, less deductions for the value of the 35 sacks of rice produced in 1945, the defendant's indebtedness under the August 10 note, and a sum covering defendant's earning capacity subsequent to plaintiff's breach. This process left a balance in defendant's favor amounting to $3,195.87.

Under Point 5, plaintiff says that: "The contract, sued upon by defendant, being unilateral, the only damages recoverable by defendant for breach thereof, is reasonable value of his services to date of notice of withdrawal by plaintiff from said contract." Under Point 10, plaintiff assigns error to defendant's recovery of expenses incurred by defendant "in putting in the part of (his crop which he actually planted)" in addition to his recovery of net profits under the contract, on the ground

that defendant thereby recovered double damages.

Points 5 and 10 are overruled.

■ First, regarding defendant's right to net profit: Defendant was entitled to recover the net profits he would have earned under his contract with plaintiff for the following reasons:

(a) The contract was not unilateral in the sense defendant has in mind (a contract which plaintiff might terminate at will because defendant was not obligated thereunder); the plaintiff's argument to the contrary has been denied under our discussions of Points 1 and 3.

(b) Plaintiff has prevented the performance of the contract, and defendant was entitled to recover his probable net profits because the parties contemplated that he would earn them. These profits presumably constituted defendant's inducement to enter into the contract, and the parties in effect stipulated that he should have them. National Bank of Cleburne v. M. M. Pittman Roller Mill, Tex.Civ.App., 265 S.W. 1024, 36 A.L.R. 1405; Waco Tap R. Co. v. Shirley, 45 Tex. 355.

The possibly speculative character of these profits did not affect defendant's right of recovery; probable net profits to be earned from a growing crop or from a crop to be grown have been awarded, or considered in determining damages, in both tort and contract cases. International & G. N. R. Co. v. Pape, 73 Tex. 501, 11 S.W. 526 (tort; damage to growing crop); Rogers v. McGuffey, 96 Tex. 565, 74 S.W. 753 (contract; crop to be grown).

■ Second, regarding defendant's recovery of expenses: What defendant's expenses were in growing his 1945 rice crop must be determined from the jury's finding under Issue 10. That issue and that finding were: "What do you find from a preponderance of the evidence it cost the defendant, Danis Young, to grow the rice produced by him during the year 1945? Answer: $2,220.00." We construe this issue as requiring the jury to ascertain and to express in their finding all of the expenses incurred by defendant in attempting to grow a rice crop in 1945. This would include defendant's expense in preparing

for a 300 acre crop before plaintiff breached his contract, and also defendant's expense in cultivating 80 acres subsequent to plaintiff's breach; and the jury's finding of $2,220 therefore represents a lump sum covering two items.

Defendant's right to recover these items is governed by different rules. The first item, namely, defendant's expense in preparing for a 300 acre crop, was assuredly required to be made by defendant under each version of the contract before the trial court. Most of this expense was wasted, and this waste was caused by plaintiff. Under Issue 5, the jury found that defendant's failure to plant more than 80 acres "was directly and proximately caused" by plaintiff's breach; and plaintiff's wrong thus directly caused an actual loss to defendant which was clearly within the contemplation of the parties and which defendant was therefore entitled to recover. The net profits did not compensate defendant for this loss. The sum at which the profits were calculated excluded all expenses; it was truly net profit and if defendant had not recovered this expense the trial court's judgment would have charged defendant with double costs instead of protecting plaintiff against double damages. There is ample authority for awarding to defendant in a case like this (where plaintiff's breach prevented the performance of the contract), the expense he incurred prior to plaintiff's breach. United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168; Wells v. Nat'l Life Ass'n, 5 Cir., 99 F. 222, 53 L.R.A. 33; Osage Oil & Refining Co. v. Lee Farm Oil Co., Tex.Civ. App., 230 S.W. 518, page 520; Knickerbocker Club, Inc. v. Pearson Tile & Mantel Co., Tex.Civ.App., 82 S.W.2d 736; Childress v. Smith, 90 Tex. 610, 40 S.W. 389, page 391, where the court said: "Again, it is clear that, in order to fix any liability on the part of Childress for the loss sustained by the sureties in selling the material they had purchased and prepared to put into the building, it was incumbent upon plaintiff to establish the fact that they were justified in abandoning the work." Doubtless defendant's expense prior to plaintiff's breach would have to be reasonable and strictly relevant to the subject matter of the contract, but no complaint has been made regarding this matter.

The second item of expense is the cost of cultivating the 80 acre crop after plaintiff's breach, and this constitutes expense incurred in attempting to minimize defendant's damages. This expense resulted in additional loss and defendant may—or may not—have acted imprudently. However, we are only concerned here with the legal measure of damages, that is, with defendant's right to recover this expense in any event. If defendant acted prudently in attempting to minimize his damages, and if his relevant expense amounted to a reasonable sum, then he was entitled to recover this expense from plaintiff, even though he aggravated his loss from plaintiff's breach instead of reducing it. Gulf, C. & S. F. R. Co. v. Keith, 74 Tex. 287, 11 S.W. 1117; Nading v. Denison & P. Suburban R. Co., 22 Tex.Civ. App. 173, 54 S.W. 412; Waco Artesian Water Co. v. Cauble, 19 Tex.Civ.App. 417, 47 S.W. 538; St. Louis S. W. Ry. Co. v. Chambliss, Tex.Civ.App., 54 S.W. 401; Southwestern Tel. & Tel. Co. v. Krause, Tex.Civ.App., 92 S.W. 431; Texas & P. Ry. Co. v. Mercer, 127 Tex. 220, 90 S.W. 2d 557, page 560 (Par. 4–6), 106 A.L.R. 1299.

These comments dispose of plaintiff's objection and we decide nothing else. Obviously defendant's net profits would not have compensated defendant for expense incurred in attempting to minimize his damages; and defendant's recovery of this expense in addition to his profits did not give him double damages.

Under Point 6 plaintiff says that the value of defendant's services which defendant would himself have performed under the contract but which he actually did not perform because the contract was breached should have been deducted from defendant's net profits; that defendant failed to prove this value, and that "having failed to prove this item he failed to make his case." Under Point 7 plaintiff assigns error to the trial court's refusal to submit plaintiff's requested Issue 3, requiring the jury to find "the reasonable value of defendant's services which he was not

required to perform by reason of his not obtaining the money with which to complete his 1945 rice crop."

Points 6 and 7 are overruled. There is nothing to show that the contract required any personal services from defendant; that is, we find no evidence that defendant promised to personally plow or plant or cultivate the land or to harvest the crop. However, defendant's circumstances indicate that he would have engaged to some extent in all of these matters and we shall assume, without expressly deciding, that he impliedly agreed to do so. It has been held under various contracts that such services constituted a part of the expenses to be incurred and should be included among the items of expense to be deducted in estimating net profits. Waco Tap R. Co. v. Shirley, 45 Tex. 355, page 375; Porter & McMillan v. Burkett, 65 Tex. 383, page 385, citing United States v. Speed, 8 Wall. 77, 19 L.Ed. 449; Long v. McCauley, Tex. Sup., 3 S.W. 689, page 692 ("Appellee's loss was the contract price, less the cost to him of carrying it out. This cost includes the value of his own services, in addition to the outlay of money on his part necessary to carry out the stipulations of his agreement, and it would have been proper for the court to so have instructed the jury."); Joske Bros. v. Pleasants, 15 Tex.Civ.App. 433, 39 S.W. 586, pages 589, 590. And it has been held in another type of case that the services were not to be deducted. Crews v. Cortez, 102 Tex. 111, 113 S.W. 523, 38 L.R.A.,N.S., 713.

However, the following testimony by defendant, showing the total expense to be incurred in growing his 1945 crop, presumably included this item and defendant was not required as a matter of law to go into further detail:

"Q. You have grown rice crops before, haven't you? A. Yes, sir.

"Q. Many years? A. Yes, sir.

"Q. And you have kept up with your expenses through the years? A. Yes, sir.

"Q. And you know the number of acres you had laid out to grow rice last year? A. Yes, sir.

"Q. Then from your experience and the number of acres, can you estimate what it would have cost you last year? A. Yes, sir.

"Q. To have grown the full acreage? A. Yes, sir.

"Q. What would that be? A. It would have cost me at least ten thousand dollars to raise the crop I would have raised last year.

"Q. Would it cost you more or less? A. Yes, sir.

"Q. Which would it have been? A. Around ten thousand dollars.

"Q. That would have been the cost of growing the entire acreage you had? A. Yes, sir."

Probable cost may be proved in this manner. Joske Bros. v. Pleasants, 15 Tex.Civ. App. 433, 39 S.W. 586, page 589 (Par. 2, 3); Texas & W. Tel. & Tel. Co. v. McKenzie, 36 Tex.Civ.App. 178, 81 S.W. 581, page 585.

Plaintiff's requested issue 3 was properly refused. The trial court submitted the ultimate issue in Issue 13 of the charge, which with the jury's finding reads:

"How much do you find from a preponderance of the evidence it would have cost the defendant, Danis Young, to have produced, harvested, and prepared for market the sacks of rice, if any, that you stated in answer to special issue No. 11, if you stated any number?

Answer in dollars and cents.

Answer: $4,800."

No complaint has been made of the form given Issue 13. Plaintiff's requested Issue 3 was evidentiary and was included within the subject matter of Issue 13.

Under Points 8, 11, 12 and 13, plaintiff assigns error to various elements of the trial court's calculations of defendant's damages.

Under point 8 plaintiff says that the finding in response to Issue 10 is not supported by the evidence. The jury found under Issue 10 that "it cost the defendant ($2220) to grow the rice produced by him during the year 1945"; and under Issue 8, that defendant "actually grew" 35 sacks of rice, weighing 175 pounds each, during 1945. Point 8 is overruled. Whether it shall be

sustained depends upon the construction to be given Issue 10. If Issue 10 required the jury to determine the cost of plowing, planting, cultivating and harvesting the 15 acres of land from which defendant took the 35 sacks, then Point 8 is good because the only cost shown by the evidence is defendant's total expense in preparing for the 300 acre crop and in trying to grow an 80 acre crop. However, we construe Issue 10 as requiring that the jury find the amount of this total expense. This seems the most reasonable construction for several reasons. The total expense was the ultimate issue; the cost of the 35 sacks, grown on 15 acres, was an evidentiary fact. Further, the narrow construction of Issue 10 would exclude even defendant's expense in plowing, planting and cultivating the 65 acres out of the 80 acres from which defendant got no return; this was an important item and no reason appears for its exclusion from the jury. Finally, the sum found ($2,220) in response to Issue 10 shows that the jury construed the issue as we have because this sum obviously represents their estimate of defendant's total expense. We have read the statement of facts and hold without further discussion that under the broad construction we give Issue 10, the jury's finding in response thereto is supported by the evidence.

Under Points 11, 12, and 13, plaintiff attacks the finding which the jury made in response to Issue 12, namely, that the reasonable market value of a 175 pound sack of rice grown during 1945 was $7.50. Plaintiff says that the value found exceeds the OPA ceiling price and further, that the finding is not supported by the evidence.

We have no information regarding the OPA ceiling price. Specifically, we find no evidence in the statement of facts regarding this price; but under our judgment, this ceiling price (and Point 11, raising this contention) are immaterial.

Points 12 and 13, however, are sustained. We hold that the $7.50 found by the jury is excessive and at the foot of this opinion have suggested a remittitur.

The only testimony in the record tending to show the material value of rice in 1945 is the following:

(a) Plaintiff testified:

"Q. Mr. Morgan, do you keep up with the rice market and know what the market price of rice is? A. Yes, sir.

"Q. In the fall and winter at the end of the harvesting season in 1945, what was the prevailing market price of the type of rice that was grown on Danis Young's land? A. Six-fifteen.

"Q. Six-fifteen for what—how much? A. Per barrel.

"Q. Six-fifteen? A. Six-fifteen a barrel.

"Q. Is a barrel little less than a sack or the same? A. A barrel is about 178 pounds.

"Q. And a sack is about 210 pounds? A. Some of them are 170; some of them are 210 pounds. Most of the sacks the last year, two or three years, have been small sacks.

"Q. The last few years a standard sack would weigh about 175 pounds. Isn't that about the weight they run or a little more than that? A. Yes; something—about 175, maybe 195.

"Q. 175 or 195? A. Maybe 200; it depends on how they sack it."

(b) Defendant testified:

"Q. What kind of rice were you planting in 1945? A. Blue Rose.

\* \* \* \* \* \*

"Q. What was the prevailing market price of the type of rice you were growing there in the last year, in the month and year of the harvest season of the year 1945? A. The rice I was supposed to raise in 1945 was Blue Rose. The selling price on that was $6.15 a barrel, and, of course, the mill made the difference on the sacks and hauling, if you had any better rice, which would run your rice about $6.50 a barrel, if you had a good grade of rice.

"Q. How much would that be for the standard sacks of rice? A. The standard sacks weighed around—Now, they weighed between 175 and 185 pounds a sack, and a barrel is only 163 pounds to the barrel.

"Q. Do you know what it would bring for one sack—the price per sack? A. Well, sir, I never sold any with one sack.

"Q. I mean per sack in large quantities? A. Well, I would have to let somebody that knows how to figure that up. You can figure your rice at $6.15 a barrel and if your sack weighed 185 pounds and your barrel weighed 163 pounds, you can figure the difference."

(c) Plaintiff's witness Guillory testified:

"Q. Do you know the reasonable market value of rice in your community in the fall and winter of 1945? A. You mean the price of rice?

"Q. Yes. A. It run from five and a half to eight and a quarter, depending on the variety of rice you plant."

This evidence will not support the $7.50 value found by the jury under Issue 12. The testimony of plaintiff and defendant is based on barrel weights, and according to plaintiff's testimony the finding of $7.50 is much too high. Defendant says a barrel weighed 163 pounds and that this barrel weight of Blue Rose rice had a value of $6.15. To this, he added 35 cents for cost of sack and carriage to the mill, bringing his total barrel cost to $6.50. If a 175 pound sack of Blue Rose Rice be valued proportionately, as it presumably would be, then defendant's testimony would put the value of the 175 pound sack at $6.98, which is substantially less than the jury's $7.70. Guillory's testimony is of no assistance; this witness makes the price depend upon the variety of the rice, and he did not undertake to state the value of any particular variety.

Under Points 2, 9, 17 and 18, plaintiff refers to various procedural matters, none of which we regard as of material significance. We overrule Points 2, 9, 17 and 18.

Points 2 and 9 refer to defendant's proving facts which plaintiff says he did not plead. The issues raised by this evidence were tried by consent. The variance referred to in Point 2 was not raised in the trial court. The variance referred to in Point 9 was not raised in the trial court until defendant moved for new trial. Under Rule 67 these variances were immaterial.

Under Point 17, plaintiff asserts two objections to Issue 7 of the trial court's charge. Issue 7 and the jury's finding in response thereto read:

"Do you find from a preponderance of the evidence that defendant, Danis Young, did and performed all things required of him under the contract made between him and plaintiff, E. D. Morgan, on or about November 17, 1944, as a condition to the payment to him, the said Danis Young, by plaintiff, E. D. Morgan, the sums of money promised by the plaintiff, E. D. Morgan?

Answer 'Yes' or 'No.'

Answer: Yes."

One objection, that issue 7 submitted a mixed question of law and fact, was not made in the trial court and was therefore waived. Rule 274. The other objection, that the terms of the contract referred to in Issue 7 were not "established by the issues submitted" raised the point that Issue 7 was multifarious, namely, that it required the jury to determine not only whether defendant performed certain conditions but also what conditions he agreed to perform. This objection, however, may be disregarded because Issue 7 is immaterial.

The subject matter of Issue 7 was defendant's performance of conditions to be met before plaintiff had to lend him any money, and each party had his own theory regarding the existence of these conditions. Defendant referred to only one, that he build a levee, and under Issue 4 the jury found that he had complied with his promise to build this levee. Plaintiff raised two more conditions, but these constituted defenses to defendant's cross action and under Rule 279 plaintiff had the burden of submitting these conditions to the jury. One of these, namely, the necessity of defendant's presenting evidence to plaintiff showing how defendant had used certain assets, was more or less put to the jury in Issue 15, and the jury found that no such condition was made. This left one other, namely, that defendant was to plant and water his rice before plaintiff loaned him money; and it was not proven as a matter of law that the contract contained this condition. The plaintiff waived any defense based upon such a condition because he

did not request an issue submitting this matter to the jury.

Thus we may say that defendant's theory of these conditions was submitted to the jury and found by them in defendant's favor elsewhere than in Issue 7. It may be that Issue 7 authorized the jury to determine whether the contract contained any or all of the conditions for which plaintiff contended and authorized them to find in defendant's favor that it did not; and perhaps under these circumstances it was error to submit Issue 7. However, the error consists simply in Issue 7 being multifarious as regards issues of plaintiff which were either found against plaintiff elsewhere in the charge or were waived through plaintiff's failure to submit them, and under these circumstances the error is without any significance. We may disregard Issue 7 without touching anything material to defendant's recovery.

■ Under Point 18, plaintiff assigns error to Issue 11 on the ground that "the terms of the contract (referred to in this issue) are nowhere established or inquired about in the charge." Issue 11 and the jury's finding thereunder read:

"How many standard sacks of rice of the average weight of one hundred seventy-five (175) pounds do you find from a preponderance of the evidence that defendant, Danis Young, would have grown during the year 1945 if plaintiff, E. D. Morgan, had paid to defendant, Danis Young, the sums of money promised by plaintiff, E. D. Morgan, to defendant, Danis Young, in their contract of November 17, 1944?

Answer giving number of sacks.

Answer: 1280."

The essence of the objection made under Point 18 is that Issue 11 authorized the jury to determine a material provision of the contract, namely, how much money did plaintiff agree to lend defendant, in addition to determining the number of sacks of rice which defendant might have grown with the money. Plaintiff testified to a maximum loan of $2,500. Defendant testified to a much larger sum, enough in addition to his $2,700 of assets to grow a $10,-000 rice crop. However, although the total sum to be loaned was a material provision of the contract, it was only an evidentiary fact as regards the subject matter of Issue 11. The ultimate issue to be determined was, how many sacks of rice would defendant have grown if he had gotten his money? The total sum to be loaned was a part of the evidence bearing upon this ultimate issue but it was not an ultimate issue itself. Had the jury been required to determine the total sum to be loaned, their finding would not have affected the trial court's judgment. See the authorities cited in San Augustine Independent School Dist. v. Freelove, Tex.Civ.App., 195 S.W.2d 175, pages 180, 181 (Headnote 4).

■ Under Point 14, plaintiff assigns error to the trial court's refusal to award him interest on defendant's indebtedness to him, and to award him attorney's fees.

The attorney's fees were properly denied plaintiff under this court's decision in Wagner & Chisholm v. Dunham, Tex.Civ. App., 246 S.W. 1044, page 1045 (Par. 1). Defendant did not plead an offer to credit his debt upon the damages plaintiff owed him but his denial of liability was equivalent to such an offer. Defendant's answer alleged that the August 10 note was extended by a new $10,000 note made on November 17 and (in Par. VII) that "there is no amount of money due to plaintiff herein" under the November 17 note. In paragraph XX defendant alleged that the November 17 note "because of the facts fully alleged hereinafter can not become due." "Hereinafter refers to defendant's cross action; and we construe the allegations to which we have referred as denying liability on the note because plaintiff owed defendant a larger sum in damages. Defendant's proof showed an oral extension on November 17 and an estimated expenditure of $10,000 instead of a $10,000 promissory note bearing that date; but defendant never disputed his liability nor the amount of indebtedness under the August 10 note—except upon the ground just mentioned. We think this situation falls within the sense of the ruling made in Wagner & Chisholm v. Dunham. There is also support for the denial of attorney's fees in Couturie v. Roensch, Tex.Civ.App., 134 S.W. 413, page 416, although we need not go as far as the court did in that decision.

■ The trial court erred in denying plaintiff interest on his debt. Plaintiff sued on the August 10 note, and he made a prima facie case by proving that note and its nonpayment by the defendant. Defendant says that the consideration for his promise to pay interest failed when plaintiff breached his contract, but the judgment gives defendant what he would have gotten if plaintiff had performed his contract, and defendant's argument must accordingly be denied. Defendant certainly owes plaintiff interest down to the date to which payment was extended, namely, completion of the rice harvest in 1945. If defendant's obligation to pay ended on that date, then it was a part of defendant's defense to plaintiff's suit to establish that date precisely (for defendant, not plaintiff, pleaded the extension) and this the defendant has not done. His defense to the claim for interest therefore failed, and we shall allow plaintiff five per cent interest (the rate stipulated in the August 10 note) on defendant's debt of $2,661.63 from November 17, 1944, to the date of the trial court's judgment, namely, March 29, 1945. The excess charge thus made on the $5.91 item charged defendant after November 17 is trivial and is disregarded for that reason.

■ Under Point 15, plaintiff assigns error to the trial court's refusal to foreclose his deed of trust. Point 15 is overruled. The trial court properly refused to foreclose the deed of trust because plaintiff's indebtedness in damages to defendant exceeded defendant's indebtedness to plaintiff. The trial court's judgment is supported by Rule 302.

We have now disposed of plaintiff's points of error and are come to the determination of what judgment shall be entered.

Under Point 14 we have held that plaintiff was entitled to recover five per cent interest on $2,661.63 from November 17, 1944 until March 29, 1946. This sum amounts to $181.82.

■ Under Point 12 we have held that the market value of a 175 pound sack of rice as found by the jury in response to Issue 12, namely, $7.50, was excessive. Issue 12 is material to a calculation of defendant's net profits; and because of the nature of this case, we must reverse the trial court's judgment and remand the entire cause to that court unless the excess is eliminated from the $7.50. This may be done by a remittitur. We are authorized to suggest the remittitur by Rule 440 and by the decision in Houston Belt & Terminal Ry. Co. v. Lynch, Tex.Com.App., 221 S. W. 959, construing Article 1631, R.S.1911, which is the substantial equivalent of Rule 440 as respects the matter now under consideration. We measure this excess by subtracting from the jury's $7.50 the highest sack value shown by the evidence. Houston Belt & Terminal Ry. Co. v. Lynch, supra. The sack value must be determined from the barrel value and the highest barrel value shown was $6.15 per 163 pound barrel, with 35 cents additional to cover the cost of sack and carriage, making a total value of $6.50 for a sack weighing the same as this 163 pound barrel. Proportionately, if a 163 pound sack is worth $6.50 then a 175 pound sack would be worth $6.98, and the jury's $7.50 contains a 52 cent excess. The jury found under Issue 11 that defendant would have produced 1,280 of these 175 pound sacks of rice if plaintiff had complied with his contract, and from this finding of 1,280 sacks and the $7.50 value per sack, the trial court computed defendant's gross earnings under the contract at $9,600 (being 1,280 times $7.50). This $9,600 therefore contains an excess of $665.60 (1,280 times 52¢).

Acting under Rule 440, we accordingly suggest that defendant file a remittitur of $665.60 in this court within 10 days from the date on which this opinion is filed. If this suggestion is met, we shall then reform the trial court's judgment by subtracting from the principal sum of $3,195.87 awarded defendant therein the amount of interest due to plaintiff by defendant, namely, $181.82 and the excess $665.60, leaving a balance of $2,348.45 for which sum judgment will be rendered in defendant's favor, and to that extent the judgment of the trial court will be affirmed. Otherwise, the judgment of the trial court will be reversed and the cause will be remanded to the trial court for a new trial.

### On Motion for Rehearing.

Defendant has filed the suggested remittitur within the time limited and plaintiff's motion for rehearing is before us.

Consideration of plaintiff's motion has required a restatement of some of our original conclusions; and the foregoing opinion is filed in lieu of our original opinion of February 14, 1947, which is withdrawn. We have, for convenience, incorporated in the foregoing opinion such parts of the opinion of February 12, 1947, as did not require restatement.

Plaintiff's motion for rehearing is overruled.